**HILLIS ADJUSTMENT AGENCY, INC.**

v.

**The GRAHAM COMPANY, a/k/a The Graham Agency and Steven Figlin,**

**Appeal of The Graham Company, a/k/a The Graham Agency**

**Hillis Adjustment Agency, Inc.**

v.

**The Graham Company, a/k/a The Graham Agency and Steven Figlin**

**Appeal of Steven Figlin.**

Superior Court of Pennsylvania.

Argued May 18, 2006.

Filed Nov. 17, 2006.

---

Alexander G. Bochetto, Philadelphia, for Graham Co., appellant.

David B. Snyder, Philadelphia, for Figlin, appellant.

Roger J. Harrington, Philadelphia, for appellee.

BEFORE: JOYCE, LALLY–GREEN, JJ., and McEWEN, P.J.E.

OPINION BY McEWEN, P.J.E.:

¶ 1 Appellants, The Graham Company and Steven Figlin, have filed these appeals from the judgments entered against them in the aggregate amount of $175,000.00, following a jury trial. We are compelled to reverse.

¶ 2 The basic facts of this case are not in dispute. On June 16, 2001, the Village Green Apartments complex, a multi-unit facility located in Hatboro, Pennsylvania, was heavily damaged as a result of storm-related flood waters and a gas explosion. The owner of this property was the Scully Company ("Scully").

¶ 3 Almost immediately upon being notified of the destruction, Scully's regional manager, Richard Gross, arrived at the scene to assess the damage. He was joined at the scene by William Underkoffler, the general manager of appellee, Hillis Adjustment Agency, Inc. ("Hillis"), a public adjustment firm that had been requested to send a representative to the scene by another Scully employee, William Hollin.

¶ 4 The next morning, Robert W. Hillis, the owner of the Hillis agency, arrived at the scene to survey the damage and to discuss an adjustment contract. This discussion resulted in the execution, on June 17, 2001, of two adjustment contracts—one covering fire damage and one covering water damage—by and between Hillis and Scully. Both contracts contained statutorily required rescission language permitting Scully to rescind the contracts within four calendar days of their execution.[1] Mr. Hillis and employees of his company began working on the site within twenty four hours of the signing of the contracts.

¶ 5 Thereafter, on June 19, 2001, three days after the storm and the second day after the adjustment contracts were signed between Hillis and Scully, a meeting was held in Scully's office to discuss the Village Green Apartments damage, and the status of the adjustment contracts. At various times the following individuals participated in that meeting: (1) James and Michael Scully, the principal owners of Scully, (2) Richard Gross and William Hollin, employees of Scully, (3) Robert Dietzel and Michael J. Mitchell, who were the account manager and vice president of appellant The Graham Company ("Graham"), which was Scully's insurance broker, (4) appellee

---

1. *See:* 63 P.S. § 1605(a).

Robert W. Hillis, and (5) appellant Steven Figlin ("Figlin"), who was also a public adjuster. Following that meeting, and within the four day statutorily permitted rescission period, Scully cancelled its contracts with Hillis, and signed public adjusting contracts with Figlin. Figlin thereafter handled the insurance related matters for Scully, and eventually obtained for Scully a settlement from its insurers in the amount of $6,361,184.79. As compensation Figlin was paid an adjustor's fee of $175,000.00, which was an amount that, assuming the same recovery, was approximately $140,000.00 less than the fee that Scully would have been required to pay Hillis under the rescinded contracts.

¶ 6 Thereafter, on June 18, 2003, Hillis commenced the action giving rise to these consolidated appeals, in which it sought damages against Graham and Figlin for tortious interference with contractual relations. A jury trial ensued in the Court of Common Pleas of Philadelphia County, and a jury verdict in the amount of $175,000.00 was rendered in favor of Hillis, with liability against the defendants apportioned as follows: 75% against Graham and 25% against Figlin. Both defendants filed post-trial motions seeking, *inter alia,* judgment notwithstanding the verdict, which were denied. These appeals, which were consolidated for disposition by order of this Court, followed.

¶ 7 Appellants, in their respective briefs filed in support of this appeal have set out the following questions for our review:

### Appeal of The Graham Company
### No. 2839 EDA 2005

Whether the rendering of advice by an insurance broker to its client to cancel a contract with an insurance adjuster within a four-day cancellation period

provided by Pennsylvania insurance regulations is privileged, thereby barring the cancelled adjuster's claim for interference with contractual relations?

Whether, on a claim for interference with contractual relations, the public policy determination of whether a defendant's actions are privileged is an issue for the court and not the jury?

### Appeal of Steven Figlin
### No. 2917 EDA 2005

Whether the trial court erred in submitting the question of whether Figlin's conduct was privileged to the jury instead of determining the defense of privilege as a matter of law?

Whether the trial court erred in denying Figlin's motion for judgment notwithstanding the verdict on plaintiff's claim of tortious interference with actual or prospective contractual relations where plaintiff (Hillis) failed to proffer any evidence of Figlin's knowledge or intent?

■ ¶ 8 The touchstone for our consideration of this appeal is the statute governing the relationship between insureds who have suffered losses and public adjusters. That statute provides in relevant part:

Any contract with a public adjuster may be rescinded by any person signing the contract. Such action must be taken within four calendar days after signature.

63 P.S. § 1605(a).[2] Thus, under the statute, every contract that is signed between a public adjuster and a client is provisional, and remains so until the expiration of the rescission period. This fact was well known to Hillis, and is part of the business landscape in which all public adjusters do business in Pennsylvania.

**2.** The statute further provides that "The Insurance Commissioner may issue regulations to assure the implementation of this section." 63 P.S. § 1605(a).

¶ 9 Nevertheless, Hillis seeks to limit the clear import of the statutory language by citing to insurance regulation 115.4, which provides:

No insurance company, its employes [sic], officers or agents or a public adjuster or an employe [sic], officer or agent thereof, may induce or attempt to induce an insured to cancel an existing contract with a public adjuster.

31 Pa.Code § 115.4. Appellee, relying upon this regulation, essentially argues that neither Graham nor Figlin was permitted to discuss with Scully the relative merit of the contracts that Scully had signed with Hillis. We do not accept this interpretation of the regulation, for there is no indication that regulation 115.4 was intended in any way to curtail the right of an insured, under the enabling statute, to rescind the initial provisional contract. The explicit language of the statute makes clear that the legislature intended to grant the insured a full opportunity to reevaluate its initial choice of public adjuster. Consequently, in order to guarantee that that right of reevaluation is not illusory, the insured owner must be permitted to obtain information and advice from all available sources, as well as to seek competitive bids from other public adjustment firms, and, as a necessary corollary, those sources must be free to provide that information.

¶ 10 Interestingly enough, while the Pennsylvania Code does not provide a discussion of the Commissioner's rationale in adopting regulation 115.4, the regulation was adopted on May 16, 1980, a date approximately two months after this Court held argument on March 19, 1980, in the case of *Johnson v. Pilgrim Mutual Insurance Company*, 284 Pa.Super. 314, 425 A.2d 1119 (1981). The Court, in *Johnson*, addressed the conduct of an insurance company that actively dissuaded policyholders from using the services of public adjusters by, among other things, threatening to delay the processing of their claims. Though the opinion of this Court was issued after the enactment of regulation 115.4, the following statement of the Court recounts the practices that existed at the time the Commissioner acted:

We believe, however, the record portrays a sordid and shabby picture. People whose homes have been burned are always in a very unfortunate position. Poor people, who have no resources to make repairs and other living arrangements, are especially unfortunate. In dealing with companies they have paid to insure their properties against fire, they are in a very poor bargaining position. They are often forced, by the emergency of the circumstances, to accept whatever money is offered by the insurer, rather than insist upon a fair figure. This is especially so, since such insureds are not likely to know just what they are entitled to. They can greatly benefit from the services of an adjustment company, which has the knowledge and personnel to determine what they are entitled to. The (appellant), in our view, sought to penalize all the private (appellees) herein for having hired the adjustment company. It did so, not only passively by not settling the claims, but actively by discouraging the parties from using an adjustment company, and by refusing, on some occasions, to accept the adjustment company as the legitimate representative of the individual (appellees). It clearly interfered with the business relationship between the adjustment company and its clients.

*Johnson, id.,* at 1123–1124. Upon this record the Court affirmed the decision of the trial court to enjoin the insurance company "from intentionally interfering with the known contractual relationships between [the public adjuster] and any of its existing or future clients." *Id.* at 1124.

¶ 11 Thus, the conditions which spurred the Commissioner to enact regulation 115.4 evinced a need to protect the citizenry, and particularly the policyholders, of this Commonwealth from the predatory practices of insurances companies, rather than a need to protect the business interests of public adjusters. Consequently, there is simply no basis upon which to believe that regulation 115.4 was intended to protect public adjusters from competition for business during the initial days after a loss. In fact, all inferences are to the contrary.

■■■■ ¶ 12 Turning to the merits of this appeal, the underlying cause of action brought by Hillis against both appellants was for tortious interference with contractual relations, the elements of which are as follows:

(1) the existence of a contractual relationship between the plaintiff and a third party;

(2) purposeful action on the part of the defendant intended to harm the relationship;

(3) the absence of privilege or justification on the part of the defendant; and

(4) actual damages resulting from the defendant's conduct.

*See: Reading Radio, Inc. v. Fink, et al.,* 833 A.2d 199, 211 (Pa.Super.2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004); *Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.1997). *See generally:* Restatement (Second) of Torts § 766, and *Triffin v. Janssen,* 426 Pa.Super. 57, 626 A.2d 571, 574 n. 4 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 32 (1994) (acknowledging that the view of the drafters of the Restatement (Second) of Torts has been accepted into the law of Pennsylvania).

■■■■ ¶ 13 Since, as earlier explained, the agreements between Hillis and Scully were merely provisional, it is clear at the outset of our analysis that Hillis had no reasonable expectation in the inviolability of those agreements.[3] Moreover, the facts establish, and indeed are undisputed, that all the challenged conduct of the appellants occurred during the four day statutory right of rescission period. Consequently, on this record, the actions of appellants were within the penumbra of the statutory privilege granted to Scully,[4] and, as a mat-

---

3. Pursuant to the regulation making authority of the Insurance Commissioner, the Pennsylvania Code specifically protects public adjusters whose contracts are rescinded from suffering any losses due to expenditures incurred during the period they were performing under the provisional contract, providing:

> [T]he insured shall be liable for reasonable and necessary emergency out-of-pocket expenses or services which were paid from or incurred by the public adjuster during the period preceding cancellation.

31 Pa.Code § 115.3(f).

4. The holding of the Court is grounded in the statutory privilege provided at 63 P.S. § 1605(a). It also merits mention that this Court in the case of *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545, 549 (1991), *appeal denied,* 530 Pa. 666, 610 A.2d 46 (1992) provided a common law analysis regarding the question of privilege as it relates to the party accused of interfering with a prospective contract, and cited to the following excerpt from comment b to § 767 of the Restatement (Second) of Torts as germane:

> Unlike other intentional torts such as intentional injury to property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act in the matter stated in §§ 766, 766A, or 766B [relating to interference with contracts]. Because of this fact, this Section [§ 767 Factors in Determining Whether Interference is Improper] is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; [sic] whether, upon a consideration of the rela-

ter of law, there was no basis upon which to find that Hillis could negate that privilege. Therefore, appellants were entitled to the grant of their respective motions for judgment notwithstanding the verdict.[5]

¶ 14 Judgments reversed. Case remanded for entry of judgments notwithstanding the verdict in favor of appellants. Jurisdiction relinquished.

¶ 15 JOYCE, J. CONCURS IN THE RESULT.

tive factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Ruffing*, id., *citing Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 433 n. 17, 393 A.2d 1175, 1184 n. 17 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). The Restatement section to which the comment refers provides:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

§ 767 Restatement (Second) of Torts.

In the context of the present case, in which appellants were the "actors" and Hillis was the "other," and viewing the evidence in the light most favorable to Hillis as the verdict winner, the record reveals the following:

(a) Graham intentionally recommended Figlin as an alternative public adjuster to its client, Scully.

(b) Graham's motive was to provide Scully with a public adjuster with whom it was more familiar.

(c) As a result of Scully heeding Graham's advice, Hillis lost a contract that had a value of approximately $300,000.00, Figlin gained a contract that had a value of $175,000.00, and Scully, as the insured, thereby obtained the benefit of a substantially reduced fee.

(d) The interest of Graham was to fulfill its perceived duty as Scully's insurance broker.

(e) The social interest to be advanced is the protection of the rights of insured persons who have suffered catastrophic losses, as well as the free flow of information between business professionals who have been hired by clients for their expertise.

(f) Graham's actions, as well as those of Figlin, were directly and proximately related to the loss of the contract by Hillis.

(g) Graham was in a business relationship with Scully that involved the provision of insurance related services, which included the authority to "recommend the use of a public adjuster in order to maximize [the] recovery [of insurance benefits] and reduce the administrative burden of preparing proofs of loss." Graham Exhibit 4.

Thus, the position espoused by the appellants that they were entitled to judgment notwithstanding the verdict under traditional common law principles is not without merit. *See also: Allied Security, Inc. v. Security Unlimited, Inc.*, 265 Pa.Super. 297, 401 A.2d 1219 (1979) (discussing "competitors' privilege").

5. "Judgment notwithstanding the verdict can be entered only if the movant is entitled to judgment as a matter of law or if evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Jara v. Rexworks*, 718 A.2d 788, 792 (Pa.Super.1998), *appeal denied*, 558 Pa. 620, 737 A.2d 743 (1999) (citation omitted).