THE YORK GROUP, INC.

v.

YORKTOWNE CASKETS, INC., Batesville Casket Company, Inc., Batesville Services, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen, and Mark Stiner.

Appeal of Batesville Casket Company, Inc., and Batesville Services Inc.

The York Group, Inc.

v.

Yorktowne Caskets, Inc., Batesville Casket Company, Inc., Batesville Services, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen, and Mark Stiner.

Appeal of Batesville Casket Company, Inc., and Batesville Services Inc.

The York Group, Inc.

v.

Yorktowne Caskets, Inc., Batesville Casket Company, Inc., Batesville Services, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen, and Mark Stiner.

Appeal of Yorktowne Caskets, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen and Mark Stiner.

The York Group, Inc.

v.

Yorktowne Caskets, Inc., Batesville Casket Company, Inc., Batesville Services, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen, and Mark Stiner.

Appeal of Yorktowne Caskets, Inc., Neil Crispo, Victoria Crispo, Bryan E. Elicker, Sr., Beth Elicker, Geoffrey S. Abendschoen and Mark Stiner.

Superior Court of Pennsylvania.

Argued June 21, 2006.

Filed April 23, 2007.

Reargument Denied July 3, 2007.

John R. Maley, Indianapolis, IN, for Batesville Services.

Anthony J. Rash, Pittsburgh, for Batesville Casket.

Kevin P. Allen, Pittsburgh, for York Group.

Robert Byer, Pittsburgh, for Crispo, Elicker, Yorktowne Casket and Abendschoen.

BEFORE: BOWES, PANELLA and POPOVICH, JJ.

OPINION BY BOWES, J.:

¶ 1 In this appeal, we consider whether the trial court had any apparently reasonable grounds to enjoin Yorktowne Caskets, Inc. ("Yorktowne") from breaching a contract that it had with Appellee, York Group, Inc. ("York"), and to enjoin Batesville Casket Company, Inc. ("Batesville") and the individual defendants listed below from intentionally interfering with the contract between Yorktowne and York. After careful review of the record and mindful of our applicable standard of review, we hereby affirm.

¶ 2 The three business entities involved in this action include: 1) York, which is the number two casket manufacturer in America; 2) Yorktowne, which sells caskets and other funeral products to funeral directors in the northeastern United States and accounts for thirty percent of York's sales; and 3) Batesville, York's primary competitor and the number one casket manufacturer in America. Yorktowne is owned by six individuals, who are also individual defendants in this action. Four of the shareholders are married couples: Neil and Vic-

toria Crispo (fifty-one percent), and Bryan E. and Beth Elicker (twenty-four percent). Geoffrey S. Abendschoen owns twenty-four percent, and Mark Stiner owns the remaining one percent. Messrs. Crispo, Elicker, and Abendschoen, who together with their spouses hold ninety-nine percent of Yorktowne's stock, also serve as the key employees of Yorktowne, and all three sit on its board of directors. Specifically, Mr. Crispo is the company's chief executive officer, Mr. Elicker is its chief operating officer, and Mr. Abendschoen is the chief financial officer. The individual defendants will be referred to collectively as the shareholders.

¶ 3 In 1988, York and Yorktowne entered into a distributorship agreement whereby Yorktowne agreed to sell and promote York caskets. Effective August 7, 2004, this agreement was terminated by Yorktowne based on its dissatisfaction with the discount that it was receiving from York. After unsuccessfully attempting to market Chinese-manufactured caskets to funeral directors, Yorktowne returned to discussions with York about a renewal of their contractual relationship. Messrs. Crispo, Elicker, and Abendschoen were personally involved in the negotiations, which culminated in a two-year distributorship agreement executed on April 15, 2005 (the "2005 distributor agreement").

¶ 4 The 2005 distributor agreement contains a number of contractual provisions germane to the trial court's grant of the preliminary injunction. In return for the desired discounts, Yorktowne, as distributor, agreed to purchase all of its caskets from York for the contractual term of two years. The 2005 distributor agreement provides that Yorktowne shall use its best efforts to promote and sell York products and that Yorktowne, **"its shareholders** and all of **its employees** shall not during the Term of this Agreement, either directly or indirectly, (i) order, sell, distribute or

market products of the same style or functionality" as York caskets. Distributor Agreement, 4/15/05, at § 1.2(b) (emphasis added) (sometimes referred to as the "exclusivity provision"). After specific negotiations on this point, York retained the right in the 2005 distributor agreement to use another entity to disseminate its products within the territory granted to Yorktowne. Yorktowne acknowledged in that same agreement that it may be privy to business product pricing, financial, marketing, technical and other proprietary and sensitive information and agreed not to disclose that information to third parties. *Id.* at § 8.2 (sometimes referred to as the "confidentiality provision.").

¶ 5 In the agreement, Yorktowne acknowledged that York had an interest in the control and management of the entities authorized to sell it products, and as a result, Yorktowne expressly agreed that 1) the 2005 distributor agreement was not assignable without York's prior, written consent; 2) any such assignment was null and void; 3) York had the right of first refusal if Yorktowne proposed to sell its stock or assets; and 4) York's failure to exercise its right of first refusal did **not** waive the non-assignment provision of the agreement. Assignment was defined to include a sale of a specified percentage of the stock of Yorktowne. The contract states, "A substantial change of control, direct or indirect of [Yorktowne] shall constitute an assignment for purpose of this Agreement," and a substantial change of control "shall be deemed to have occurred when any person ... secures a fifteen percent (15%) increase of an ownership interest in" Yorktowne. *Id.* at § 8.9. (sometimes referred to as the "non-assignment provision.").

¶ 6 Section 3.3 of the agreement provides that Yorktowne "agrees that in the event any direct or indirect owner or bene-

ficial owner of any interest in [Yorktowne] shall sell, offer to sell, or transfer such interest, or [Yorktowne] shall sell, offer to sell, dispose of or transfer all or any substantial part of its assets, in each such case to any person other than [Yorktowne] ... York shall have the right of first refusal...." In addition, Yorktowne's by-laws provide Yorktowne with the ability to prevent any assignment as defined by the 2005 distributor agreement due to a change in stock ownership by vesting Yorktowne with the right to buy, at a price Yorktowne was to have already established, the shares of stock of any Yorktowne shareholder who sought to sell that stock.

¶ 7 While the 2005 distributor agreement contains a liquidated damages clause, it also includes a provision that the liquidated damages clause "does not preclude the right of York to pursue specific performance of the Agreement as an additional remedy." *Id.* at § 8.2. The contract further states that "a breach of Section 1.2(b)," the exclusivity provision, and "Section 8.2," the confidentiality provision, "will give rise to irreparable injury, inadequately compensable in damages." *Id.* at § 8.4. Finally, Yorktowne consented to York's right to obtain injunctive relief for "the breach or threatened breach of the undertakings of the parties contained in this Agreement." *Id.*

¶ 8 After the 2005 distributor agreement was negotiated, York acquired a competitor of Yorktowne, which, as noted, it was specifically empowered to do pursuant to the terms of the 2005 distributor agreement. In response, Yorktowne's shareholders entered into negotiations for the sale of their stock to Batesville, which is York's primary competitor. In an effort to avoid the provisions of the 2005 distributor agreement, the sale was structured as a

sale of stock to Batesville by Mr. Crispo and his wife, Mr. Elicker and his wife, Mr. Abendschoen, and Mr. Stiner. The corporation did not elect to exercise its right of first refusal to purchase the stock; rather, the shareholders expressly waived their rights to do so, and Yorktowne never exercised its right. The negotiations culminated in a stock purchase agreement entered among the shareholders of Yorktowne and Batesville. The terms of the agreement provide that it is enforceable both against Yorktowne's shareholders and against Yorktowne itself. Stock Purchase Agreement, 9/21/05, at § 3.2.

¶ 9 Once aware of the existence of the stock purchase agreement, York instituted this action, setting forth causes of action for breach of contract, promissory estoppel, and intentional interference with contractual relations. It obtained an *ex parte* preliminary injunction which was replaced by a preliminary injunction that was ordered after two days of hearings with participation of all the parties.[1]

¶ 10 During the course of the hearings, York presented evidence regarding the breach or potential breach of four different provisions of the 2005 distributor agreement. First, York was not provided its right of first refusal regarding the stock sale. Second, consummation of the stock purchase agreement would have violated the non-assignment provision. Third, during the course of negotiations for the stock purchase agreement, Yorktowne employees revealed York's confidential information to Batesville in violation of the confidentiality provision and all of Yorktowne's records would have been disseminated to Batesville after the stock sale. Finally, in violation of the exclusivity provision, Yorktowne had begun to market Batesville products.

---

**1.** The propriety of the *ex parte* preliminary injunction was mooted by entry of the injunction presently contested on appeal and will not be examined.

¶ 11 The trial court was presented with the following evidence. During the course of negotiations with Batesville, Messrs. Crispo, Elicker, and Abendschoen, the key employees of Yorktowne, divulged confidential information about York's business practices and pricing information to Batesville in violation of the 2005 distributor agreement. The stock purchase agreement was enforceable against Yorktowne pursuant to section 3.2. In addition, Yorktowne paid the fees for the attorney who represented the shareholders during the negotiations. York's prior written consent was not obtained prior to execution of the stock purchase agreement even though performance of the stock purchase agreement would have placed Yorktowne in breach of the non-assignment provision of the 2005 distributor agreement. Also in violation of the distributorship agreement, York was not provided its right of first refusal to purchase the stock of Yorktowne's shareholders. After the stock purchase agreement among Yorktowne's shareholders and Batesville was reached, Yorktowne began to criticize York's products and to market those of Batesville, in violation of the exclusivity provision contained in section 1.2(b) of the 2005 distributor agreement.

¶ 12 The trial court entered the order presently under review:

AND NOW, to wit, this 9th day of November 2005, upon consideration of Plaintiff's Motion for Special and/or Preliminary Injunction, Defendants' responsive pleadings, and oral argument, it is hereby ORDERED as follows:

(a) Yorktowne, the Shareholders, and Batesville Casket and/or Batesville Services are to refrain from further pursuit of consummation of the proposed sale of Yorktowne to Batesville Casket and/or Batesville Services;

(b) Yorktowne and the Shareholders are to provide York with the Right of First Refusal pursuant to Section 3.3 of the Agreement, and provide all of the information required by Section 3.3;

(c) Yorktowne and the Shareholders are to refrain from violating the non-assignment provisions of Section 8.9 of the Agreement;

(d) Yorktowne is to use its best efforts to promote and sell York Products and refrain from selling, marketing, or promoting any products in competition with York Products;

(e) The Shareholders, Batesville Casket and/or Batesville Services are estopped and are **to refrain from interfering with** the Agreement.

Order of Court, 11/9/05, at 1 (emphasis added). The order was modified on November 17, 2005, to include, *inter alia*, the posting of a bond by York. Yorktowne subsequently complied with subsection (b) of the order, offering York its right of first refusal, but York did not exercise its right. Since the mandatory aspect of the preliminary injunction was accomplished, it has been rendered moot for purposes of this appeal and will not be discussed further. The remaining injunctive relief is prohibitory in nature, maintaining the *status quo* among the parties.

■ ¶ 13 When an appellate court reviews an injunction maintaining the *status quo*, our inquiry is restricted to a determination of whether the record establishes "any apparently reasonable grounds" to support the trial court's decision. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.*, 573 Pa. 637, 646, 828 A.2d 995, 1001 (2003). In *Greenmoor, Inc. v. Burchick Construction Co.*, 908 A.2d 310, 313 (Pa.Super.2006), we outlined the requirements for issuance of a prohibitory injunction.

A petitioner seeking a preliminary injunction must establish every one of the following prerequisites:

First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth, and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Summit Towne Centre*, at 646–47, 828 A.2d at 1001.

■ ¶ 14 Appellants contend that the trial court abused its discretion by granting York a preliminary injunction despite its failure to establish each prerequisite to issuance of such relief. We begin our analysis with the fourth prerequisite because our discussion of that element impacts upon the discussion of the other five requirements. In order for conduct to be actionable, it must breach a duty imposed by statute or by common law. *Milicic v. Basketball Marketing Co.*, 857 A.2d 689, 696 (Pa.Super.2004). The actionable conduct in this case involves violation of the provisions of the 2005 distributor agreement.

■ ¶ 15 The following facts support both the existence of actionable conduct and the fact that York will likely prevail on the merits of its causes of action. The stock purchase agreement among the individual shareholders and Batesville was expressly enforceable against Yorktowne, and its principals executed the document. Moreover, Yorktowne's actions were in violation of the 2005 distributor agreement in various respects. Specifically, Yorktowne failed to exercise its right of first refusal to purchase the shares of its shareholders in order to prevent assignment of the 2005 distributor agreement in violation of section 8.9. In addition, Yorktowne, through its key employees Messrs. Crispo, Elicker, and Abendschoen, breached the confidentiality provision of the 2005 distributor agreement.

¶ 16 Finally, Yorktowne, through Mr. Crispo and Mr. Elicker and by other actions, breached section 1.2(b) of the 2005 distributor agreement, the exclusivity provision, as follows. As the stock purchase agreement was being negotiated, Yorktowne's employees already were proclaiming Batesville products as the best in the country, and Mr. Elicker in particular began to denigrate York's products to Yorktowne employees. In anticipation of execution of the stock purchase agreement, Mr. Crispo sent a letter to Yorktowne's clients informing them that Yorktowne was being acquired by Batesville and that Batesville understood what was needed to make a customer feel valued. Mr. Crispo's letter referred to Batesville caskets as the finest products in the funeral industry. Batesville promotional materials were distributed to Yorktowne employees, and Batesville personnel addressed a meeting

attended by Yorktowne sales personnel. Yorktowne sales personnel were instructed to contact Yorktowne customers and inform them that the product line would be of better quality and quantity once Batesville caskets were being distributed. Then, the Batesville logo was placed on Yorktowne trucks immediately after the stock purchase agreement was executed. These actions were all obviously inconsistent with Yorktowne's obligation to exclusively market York caskets and to use its best efforts to do so.

¶ 17 Appellants disingenuously claimed in a letter sent to York and now claim on appeal that they intended to exclusively sell York caskets and fulfill the exclusivity provision of the 2005 distributor agreement following consummation of the stock purchase agreement. This position is implicitly refuted by the above evidence. One does not use one's best efforts to market a product by claiming another product is superior in quality and quantity, suggesting that a competitor's product is the best, and placing the logo of another product on one's trucks. The exclusivity provision stated specifically that other casket manufacturer's products could not be marketed during the term of the distributorship agreement. Nevertheless, Appellants engaged in marketing Batesville products. Thus, we find that there was evidence to support the trial court's conclusion that the exclusivity provision of the 2005 distributor agreement had been breached by certain individual shareholders in their capacity as key employees of Yorktowne and, in turn, by Yorktowne.

¶ 18 In conclusion, there were two contractual provisions already breached when this action was instituted: the exclusivity provision and the confidentiality provision. In addition, two contractual provisions would have been breached if the stock purchase agreement were consummated: the right of first refusal granted to York

under section 3.3 and the non-assignment provision of section 8.9.

■ ¶ 19 We further find that the first prerequisite for issuance of a preliminary injunction, which is that York must show the injunction is necessary to prevent immediate and irreparable harm that would not be adequately compensated by damages, has also been met. An analysis of the existence of irreparable harm was set forth in *West Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 299 (Pa.Super.1999) (citations omitted):

> An injury is regarded as "irreparable" if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard. Our courts have held, accordingly, that it is not the initial breach of the covenant which necessarily establishes the existence of irreparable harm but rather the unbridled threat of the continuation of the violation, and incumbent disruption of the employer's customer relationships.
>
> Thus, grounds for an injunction are established where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant. The effect of such disruption may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are inherently unascertainable.... Consequently, the impending loss of a business opportunity or market advantage also may be aptly characterized as an "irreparable injury" for purposes of equitable relief.

In sum, "Extant case law makes clear that the impending loss of a business opportunity or market advantage may aptly be characterized as an 'irreparable injury' for

this purpose, i.e. for the purpose of a preliminary injunction." *Kessler v. Broder,* 851 A.2d 944, 951 (Pa.Super.2004).

¶ 20 In the present case, as indicated in the previous discussion of the contractual provisions at issue, Yorktowne expressly agreed that breach of the confidentiality and exclusively provisions of the 2005 distributor agreement constituted irreparable harm. Nevertheless, the existence of irreparable harm in this case was further confirmed by the testimony of Joseph Bartolacci, president and chief operating officer of Matthews International Corporation, the entity that owns York. Yorktowne distributes thirty percent of York's caskets, and the personal relationship between the funeral home and salesmen drives the sale of caskets. *See* N.T. Preliminary injunction hearing, 11/3/05, at 8. Mr. Bartolacci testified that 59,318 caskets were purchased by Yorktowne from Appellee in 2004, and 45,291 caskets were purchased from January 2005 to September 2005. *Id.* at 10. He also indicated that the sale of this amount of caskets to Yorktowne was important to maintain York's market share in the territories throughout the northeast. *Id.*

¶ 21 Mr. Bartolacci stated that the Yorktowne distributorship was critical to York. Batesville is York's primary competitor, and was the leader in the casket industry, selling approximately 750,000 caskets yearly, comprising over fifty percent of the caskets sold in the United States. *Id.* at 13. Mr. Bartolacci testified that the losses that Appellee would incur if this distributor contract was unlawfully assigned or terminated were incalculable because of the additional loss of goodwill and future business opportunities. *See* N.T. Preliminary injunction hearing, 11/3/05, at 28. He continued by explaining that York was in a relationship-driven business and that Yorktowne had effectively established these relationships during its years as a distributor of York's caskets. *Id.* at 29. Further, he testified that the loss of York's name being distributed throughout the marketplace would have a significant damaging effect to York's reputation. *Id.* at 29. Finally, Mr. Bartolacci clarified that $2 million was not intended to be liquidated damages if there was an unlawful termination of this agreement. This position is confirmed by language in the 2005 distributor agreement itself, which authorizes injunctive relief in addition to liquidated damages.

¶ 22 The above testimony supports the existence of a loss of market share and business opportunity if Yorktowne were to be permitted to continue to market Batesville caskets. Thus, the trial court had apparently reasonable grounds upon which to determine that York would suffer immediate and irreparable harm that could not be adequately compensated by damages if the 2005 distributor agreement was terminated or assigned, especially in light of the fact that the proposed assignment was to York's largest competitor.

¶ 23 Appellants maintain that there can be no irreparable harm as a matter of law due to the negotiated damages clause and rely upon *Summit Towne, supra,* in support of that position. Therein, our Supreme Court found that this Court erred in reversing the trial court's denial of a requested preliminary injunction to the lessor of a shopping center. The lessor had sought a mandatory injunction requiring a store proprietor to re-open his business after closing due to significant yearly losses. Our Supreme Court upheld the trial court's conclusion which rested on various grounds, one of which was that the liquidated damages clause contained in the contract was an adequate remedy at law.

¶ 24 *Summit Towne* is not applicable herein because the lessor's damages therein were quantifiable based upon the loss of

ascertainable rental income. That case did not involve loss of market share or business opportunity but merely lost rentals easily calculated based on existing business records. Herein, the parties agreed in their contract that equitable relief was available despite the existence of the liquidated damages clause and that violation of the exclusivity provision, which had been breached in this case, would constitute irreparable harm.

■ ¶ 25 The second prerequisite to the issuance of a preliminary injunction is that the party must show that greater injury would result from refusing an injunction than from granting it and concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. We find this requirement to be satisfied as well. It is apparent from Mr. Bartolacci's testimony that York would incur immediate and irreparable harm in the absence of an injunction to preserve the *status quo* until the merits of the case could be heard and determined. Further, Appellants have failed to demonstrate substantial harm resulting from the issuance of this injunction pending a decision on the merits of their claims. If, at the trial of this matter, they are able to establish their right to enter into an agreement with Batesville for the sale of their shares, Appellants will thereafter be able to complete this transaction. Accordingly, we find that greater injury would result from refusing the injunction under these circumstances. Therefore, the second prerequisite necessary to the grant of preliminary injunctive relief has been satisfied.

■ ¶ 26 The third prerequisite is that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. The wrongful conduct alleged is that Yorktowne and its shareholders entered into an agreement with Batesville in violation of the 2005 distributor agreement between Yorktowne and York and that Yorktowne employees were marketing Batesville caskets in contravention of the exclusivity provision and revealing confidential information in disregard of the confidentially section. The *status quo* to be maintained by a preliminary injunction is the legal status that preceded the pending controversy. *Allegheny Anesthesiology Associates v. Allegheny General Hospital*, 826 A.2d 886, 894 (Pa.Super.2003). In this case, the *status quo* was Yorktowne's compliance with the 2005 distributor agreement entered into with York. By enjoining Yorktowne from entering into a new agreement with Batesville and from marketing its products and revealing York's confidential information, the trial court preserved the *status quo* legally mandated by the 2005 distributor agreement. Accordingly, we find the third prerequisite to the grant of preliminary injunctive relief to be satisfied.

■ ¶ 27 The fifth prerequisite is that the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts prejudicial to the interest of individual rights, including the authority to enjoin wrongful breaches of contract where monetary damages are an inadequate remedy. *Santoro v. Morse*, 781 A.2d 1220, 1228 (Pa.Super.2001). Appellants were enjoined from pursuit or consummation of the proposed sale of Yorktowne to Batesville, which constituted a violation of the non-assignment provision of the 2005 distributor agreement, and the court also required Yorktowne to use its best efforts to exclusively promote and sell York's products as required by section 1.2, and to cease disseminating York's confidential information to its primary competitor in violation of the confidentiality provision. We find that these provisions were

reasonably suited to abate Appellants' offending activity. Accordingly, we find that the fifth prerequisite required for a grant of prohibitory preliminary injunctive relief has been satisfied.

¶ 28 The final prerequisite that must be satisfied before a preliminary injunction may be ordered is that the party seeking an injunction must show that the injunction will not adversely affect the public interest. We find no evidence in the record to support a claim that the issuance of this preliminary injunction will in any way harm the public interest. Therefore, we find the final prerequisite required for a grant of prohibitory injunctive relief to be satisfied. As all six of the prerequisites are satisfied, we find that the trial court had apparently reasonable grounds for issuance of a preliminary injunction.

¶ 29 We now examine whether there are apparently reasonable grounds for issuance of the injunction against the individual shareholders and Batesville. In this respect, we must stress that the injunction was entered not only to prevent the shareholders from directly breaching the 2005 distributor agreement through their actions as Yorktowne employees but also to prevent them from intentionally interfering with the 2005 distributor agreement between York and Yorktowne in their individual capacities. On appeal, Batesville and the individual shareholders of Yorktowne have one primary argument: they did not execute the 2005 distributor agreement, are not bound by its terms, and cannot be enjoined from breaching it.

¶ 30 However, Batesville and the individual shareholders ignore the fact that they were enjoined from interfering with the distributorship agreement and that York clearly and unequivocally pled in its complaint a cause of action for intentional interference with a contractual relationship. While we are aware that Batesville and the individual shareholders have devoted a significant amount of argument to the fact that they did not execute the 2005 distributorship agreement, they have ignored the basis for the issuance of the injunction against them. For purposes of a cause of action for intentional interference with a contractual relationship, it is irrelevant whether Batesville and Yorktowne's shareholders individually executed the 2005 distributorship agreement. While there is no doubt that Batesville and the shareholders are correct in asserting that they cannot be enjoined from breaching an agreement to which they are not parties, they wholly fail to acknowledge the existence of the cause of action for intentional interference with a contractual relationship.

¶ 31 Meanwhile, the record supports that there are apparently reasonable grounds to sustain the injunction against Batesville and the individual shareholders based on their intentional interference with the 2005 distributor agreement. We outlined the elements of a cause of action for intentional interference with an existing contractual relation in *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa.Super.2003) (quoting *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa.Super.1997)):

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

¶ 32 Herein, Batesville fails to even mention this cause of action while the individu-

al shareholders present this obtuse position:

> York has alleged that the Individual Shareholders have caused Yorktowne to breach the Distributor Agreement. A review of the trial court's Memorandum Opinion reveals that most if not all of the specific contractual concerns voiced by the Court have been waived by York's own admission that the issue of right of first refusal has been rendered moot. (Appellee's Br., at 2, n.1). Accepting York's admission of mootness as true, then it logically follows that, in addition to the right of first refusal, prerequisite terms relating to the right of first refusal, such as timely notice of the terms of the Batesville transaction, and timely notice under Section 3.2 (proposed change of ownership) identified by the trial court (Appellants' Br., App. A, at 3) are all waived and moot by virtue of York's consideration and rejection of the right of first refusal.

Reply Brief of Yorktowne and Individual Shareholders at 6.

¶ 33 This argument is the sum and substance of Appellants' attempt to challenge the issuance of the preliminary injunction based upon York's cause of action for intentional interference with contractual relationships. It is also categorically wrong. First, the clause containing the right of first refusal expressly states that York's failure to exercise its right of first refusal does **not** result in waiver of the non-assignment provision.[2] In addition, York's failure to exercise this right does **not** render moot the breach of the confidentiality and exclusivity provisions of the 2005 dis-

tributor agreement. It must be stressed that violation of York's right of first refusal was only one contractual provision that was violated in this case. As noted, there were three other contractual provisions impacted herein: the exclusivity provision, the non-assignment provision, and the confidentiality provision. The right of first refusal language states quite clearly that York retains the right to enforce the non-assignment provision even it does not exercise the right of first refusal. The fact that Yorktowne is no longer in breach of section 3.3 does not render the breach of the other three provisions of this contract moot.

■■■ ¶ 34 Of course, the significance of this argument is that Batesville and the individual shareholders do not at any point attempt to establish that the trial court erred in implicitly finding that they were not privileged or justified in interfering with the 2005 distributor agreement. In this connection, we must stress that the appealing party bears the burden of establishing that the trial court's decision is erroneous. *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800, 804 (1984) (the appellant has the burden to demonstrate the trial court's decree is erroneous due to either the evidence or the law). As a corollary to that precept is the equally important concept that an appellate court cannot reverse a court order on the basis of an issue that has not been raised by the appealing party. *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975) *(sua sponte* consideration of issues deprives court of benefit of counsel's advoca-

---

**2.** Section 3.3, containing York's right of first refusal, states (emphasis added):

Distributor agrees that in the event any direct or indirect owner or beneficial owner of any interest in Distributor shall sell, offer to sell, or transfer such interest, or Distributor shall sell, offer to sell, dispose of or transfer all of any substantial part of its

assets.... York shall have the right of first refusal. **Any refusal by York to exercise its right of first refusal shall not be deemed to be an acknowledgment or approval of any transfer of any interest(s) or all or any substantial part of the assets of Distributor to any third party.**

cy); *Knarr v. Erie Insurance Exchange,* 555 Pa. 211, 723 A.2d 664 (1999) (if appellant fails to present an issue on appeal, Superior Court is not permitted to address it, even if trial court's disposition was fundamentally wrong); *Department of Transportation v. Boros,* 533 Pa. 214, 620 A.2d 1139 (1993) (Commonwealth Court erred in reversing based on issue not raised by appellant); *Phillips Home Furnishings, Inc. v. Continental Bank,* 467 Pa. 43, 354 A.2d 542 (1976) (Superior Court was not permitted to reverse case based on claim not raised by appellant).

¶ 35 Neither Batesville nor Yorktowne's shareholders argue that their conduct was justified or privileged, as outlined by the dissent. The other elements of the cause of action were present. There is a contract between York and Yorktowne, Batesville and the majority of Yorktowne's shareholders have purposefully engaged in behavior to harm that relation, and there are actual legal damages as a result. Appellants have failed to establish that there were no apparently reasonable grounds for the trial court's decision to enjoin them from interfering with the 2005 distributor agreement. In light of this conclusion, it is irrelevant that Batesville and the individual shareholders were not signatories to the agreement and that there was no evidence to pierce the corporate veil.

¶ 36 Appellants also argue that the injunction is infirm under *Anchel v. Shea,* 762 A.2d 346, 352 (Pa.Super.2000), because the "trial court failed to provide supporting factual findings and legal conclusions." Yorktowne and Individual Shareholder's Brief at 22. *Anchel* does not stand for the proposition that the issuance of an injunction must be accompanied by findings of fact and conclusions of law. It merely states that the factual findings of the trial court must be supported by the record. Although the issuance of findings of fact and conclusions of law may be the better

practice, we are satisfied that the record herein supports the issuance of the injunction.

¶ 37 Next, we address Appellants' position that parol evidence was improperly used to establish the existence of irreparable harm. The parol evidence rule states that, absent fraud, accident, or mistake, parol evidence of a prior or contemporaneous oral agreement is not admissible to alter, vary, modify, or contradict terms of a contract which has been reduced to an integrated written instrument. *Kehr Packages, Inc. v. Fidelity Bank, N.A.,* 710 A.2d 1169 (Pa.Super.1998). Appellants are correct in their recitation of the law regarding interpretation of written contractual agreements:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Glassmere Fuel Service, Inc. v. Clear,* 900 A.2d 398, 402 (Pa.Super.2006) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 497, 854 A.2d 425, 436 (2004)).

¶ 38 Mr. Bartolacci's testimony pertained to the potential loss of goodwill and future business opportunities that may occur if York was not granted preliminary injunctive relief. His testimony was in support of York's claim that it would suffer immediate and irreparable harm that would not be adequately compensated by damages if the 2005 distributor agreement was terminated or assigned. He was not

testifying as to a prior or contemporaneous oral agreement between the parties. Furthermore, his testimony did not contradict the contract language; it actually supported it because the contract explicitly provided that breach of the exclusivity agreement would constitute irreparable harm. Accordingly, the parol evidence rule did not bar the testimony in question.

¶ 39 Appellants finally maintain that York cannot block the sale of stock because it failed to exercise its right of first refusal. They note that section 8.9 does not prohibit the shareholders' sale of stock if York declines to exercise the right of first refusal, but conveniently overlook the language of section 3.3 which expressly states that York's failure to exercise its right of first refusal does not operate as a waiver of section 8.9's non-assignment provision. Hence, this claim lacks merit.

¶ 40 Order affirmed.

¶ 41 Judge POPOVICH files a Dissenting Opinion.

## DISSENTING OPINION BY POPOVICH, J.:

¶ 1 I agree with the majority's conclusion that the injunction binding Yorktowne and Batesville should be affirmed. However, I write separately to express my belief that the prohibitory and mandatory injunction issued against the individual shareholders should be reversed. Unlike the majority, I find that the individual shareholders' interference with the distributor agreement was justified and, accordingly, did not establish a claim for intentional interference with contractual relations.

¶ 2 The majority concludes that the review of whether individual shareholders were privileged or justified in interfering with the distributor agreement between York and Yorktowne is not warranted because the appealing party, the shareholders, did not raise this issue in their brief.

However, despite the individual shareholders' failure to address this argument specifically in their brief, I believe the issue is reviewable because our review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." *Warehime v. Warehime*, 580 Pa. 201, 209, 860 A.2d 41, 46 (2004) (citation omitted). This "highly deferential" standard of review provides that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.*, at 209, 860 A.2d at 46 (citation omitted). Further, I note that this Court's scope of review in preliminary injunction matters is plenary. *Id.*, at 209, 860 A.2d at 46 (*citing Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.*, 573 Pa. 637, 645–46, 828 A.2d 995, 1000 (2003)). With the above principles in mind, I feel that this Court must examine the record to determine if the trial court had reasonable grounds for enjoining the individual shareholders. For this reason, I turn to the elements necessary to establish a cause of action for intentional interference with a contractual relation.

¶ 3 The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Reading Radio, Inc. v. Fink,* 833 A.2d 199, 211 (Pa.Super.2003) (citation omitted).

¶ 4 I agree with the majority that elements one, two, and four of this cause of action were satisfied. However, I do not find that the third element was satisfied. I note that Pennsylvania requires that a lack of justification be pleaded by the plaintiff.[3] *Yaindl v. Ingersoll–Rand Co. Standard Pump–Aldrich Div.,* 281 Pa.Super. 560, 422 A.2d 611, 625 (1980) (citation omitted); *see also Iron Age Corp. v. Dvorak,* 880 A.2d 657, 662 (Pa.Super.2005) (The burden of proof is on the party who requested the preliminary injunctive relief.). In determining the *absence of* privilege or *justification on the part of the defendant,* I consider the following applicable law. *Reading Radio, Inc.,* 833 A.2d at 211 (emphasis added).

¶ 5 It merits mention that this Court in the case of *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545, 549 (1991), *appeal denied,* 530 Pa. 666, 610 A.2d 46 (1992), provided a common law analysis regarding the question of privilege as it relates to the party accused of interfering with a prospective contract and cited to the following excerpt from comment b to § 767 of the Restatement (Second) of Torts, as germane:

> Unlike other intentional torts such as intentional injury to property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act in the matter stated in §§ 766, 766A, or 766B [relating to interference with contracts]. Because of this fact, this Section [§ 767 Factors in Determining Whether Interference is Improper] is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; [*sic* ] whether, upon a consideration of the relative factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Ruffing,* 600 A.2d at 549 (citation omitted).

¶ 6 Further, the absence of privilege or justification on the part of the defendant is merely another way of stating that the defendant's conduct must be improper. *Cloverleaf Dev., Inc. v. Horizon Financial F.A.,* 347 Pa.Super. 75, 500 A.2d 163, 168 (1985) (citation and quotation marks omitted). Where a defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and interests must be evaluated. *Id.,* 500 A.2d at 168. This process results in according or denying a privilege which, in turn, determines liability. *Id.,* 500 A.2d at 168 (quotation marks omitted). What is or is not privileged conduct is not susceptible of precise definition. *Id.,* 500 A.2d at 168

---

**3.** In its initial complaint, York baldly asserts that "[t]here is no privilege or justification for [the individual shareholders'] purposeful and wrongful conduct under these circumstances." *See* York's complaint, 10/11/05, at 17. However, York failed to back up its assertion with any relevant facts. Additionally, York has failed to argue the absence of privilege or justification to this Court on appeal. *See CGB Occupational Therapy v. RHA Health Servs.,* 357 F.3d 375 (3d Cir.2004) ( [I]n order to make out a claim of tortious interference with contractual relations, a plaintiff must show "the absence of privilege or justification on the part of the defendant.") (citation omitted). Despite York's bald assertion, I address this element due to our "highly deferential" standard of review that directs us to examine the record to determine if there were any apparently reasonable grounds for the enjoining of the individual shareholders. *Warehime,* at 209, 860 A.2d at 46.

(citations and quotation marks omitted). Interferences which are sanctioned by the rules of the game which society has adopted are considered proper. *Id.,* 500 A.2d at 168 (citations and quotation marks omitted).

¶ 7 In determining whether a defendant's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference[,] and

(g) the relations between the parties.

*Ruffing,* 600 A.2d at 549 (*citing* § 767 Restatement (Second) of Torts).

¶ 8 Accordingly, I apply the above factors to these circumstances. The nature of the individual shareholders' conduct was that they intentionally entered into a stock purchase agreement with Batesville that will result in the sale of all shares of Yorktowne to Batesville and, consequently, a change of ownership for Yorktowne. The individual shareholders' stated motive in entering into this contract was to secure a long term agreement to supply its customers with quality caskets, and to allow Yorktowne customers to have access to quality Batesville products. *See* Communication Plan for Yorktowne Announcement, 9/14/05, at 9.[4] York's interest was to maintain the existing contractual relationship between itself and Yorktowne so that Yorktowne will continue to be a distributor of York's products. The interests sought to be advanced by the individual shareholders were the interests of each individual shareholder in addition to the interests of Yorktowne and its maintenance of customer relationships. Specifically, the individual shareholders believed that Batesville was better equipped to provide its customers with updated products, and the assurance of a long term agreement. Further, in contracting with Batesville, Yorktowne would not face competition in selling products in their territory unlike their current contractual relationship in which they must compete with Milso.[5] As I discuss further *infra,* absent a restrictive provision to the contrary, an individual shareholder's rights to alienate their stock are to be enforced by the courts. *Seven Springs Farm v. Croker,* 569 Pa. 202, 210, 801 A.2d 1212, 1217 (2002). Additionally, this Court has an interest in construing a contract to give effect to the intention of the parties, *i.e.,* the intention of York to retain York-

**4.** This proposed document reads, in pertinent part, as follows:

Q: Why is [Batesville's acquisition of Yorktowne's stock] happening? A: Yorktowne initiated discussions with Batesville in an effort to secure a long-term agreement to supply its customers with quality caskets—this is something we could not get from our current casket supplier. Recent actions by York accelerated these discussions—specifically their acquisition of Milso and the canceling of our YMS seminars. Very quickly, these supply agreement conversations turned to a discussion on a possible acquisition. This acquisition will allow Yorktowne customers to have access to quality Batesville products, innovative personalization features and a comprehensive cremation product line.

**5.** In addition to its contract with Yorktowne, York also acquired the assets of Milso, one of Yorktowne's primary competitors. As a result of this acquisition, Yorktowne was forced to compete with Milso in the same distribution territories.

towne as its distributor of caskets as per the 2005 distributor agreement. *See Sanders v. Allegheny Hosp.-Parkview Div.*, 833 A.2d 179, 182 (Pa.Super.2003) (citation omitted). The individual shareholders' actions in entering into a contract with Batesville would directly and proximately relate to the loss of business relations between York and Yorktowne. Finally, the relationship between the parties was that the individual shareholders own ninety-nine percent of the stock in Yorktowne and that Yorktowne was contractually bound to York by the 2005 distributor agreement.

¶ 9 After my consideration of the above factors, I would conclude that the third element necessary to establish a cause of action for intentional interference with a contractual relation, the *absence of* privilege or *justification on the part of the defendant,* was not satisfied. *Reading Radio, Inc.*, 833 A.2d at 211 (emphasis added). I believe that the individual shareholders did not breach the 2005 distributor agreement by entering into the stock purchase agreement with Batesville because, as was determined previously, the individual shareholders were not a signatory to this agreement. Although section 1.2(b) of the 2005 distributor agreement states that "Distributor, *its shareholders* and all of its employees *shall not* during the Term of this Agreement, either directly or indirectly, (i) *order, sell distribute or market products of the same style or functionality* ...," I find that this section was not breached by the individual shareholders. This is because the individual shareholders were to sell their shares to Batesville, and Batesville has agreed to be bound by the 2005 distributor agreement during the time period that it begins to market its own products. Accordingly, it is my conclusion that this provision had not been violated by the individual shareholders because they would not be the "shareholders" who will "order, sell distribute or market products of the same style or functionality ...," after the sale of their stock to Batesville.

¶ 10 Further, despite the numerous letters and press releases signed by the individual shareholders informing customers and the public of the anticipated sale of Yorktowne stock to Batesville, I find no evidence in the record to demonstrate that the individual shareholders have engaged in an actual order, sale, distribution, or marketing of Batesville's products to Yorktowne's customers. The individual shareholders maintained that they intended to honor the 2005 distributor agreement upon the consummation of the transaction with Batesville. In fact, section 6.2 (Exclusivity) of the stock purchase agreement among Batesville and the individual shareholders required exclusivity to Batesville, "except for any actions taken pursuant to or under a Distributor Agreement between [Yorktowne] and York dated April 15, 2005...." *See* Stock purchase agreement, 9/21/05, at 27. Additionally, Mr. Elicker testified that Yorktowne had not purchased one casket from Batesville, and, in fact, had placed an order for 2,000 more caskets from York. *See* N.T. 10/26/05, at 161. Mr. Elicker testified that "[the individual shareholders] are fulfilling [their] obligations of the Distributor Agreement and intend to [continue to] do so." *Id.,* at 161.

¶ 11 Further, regarding the confidentiality clause contained in section 8.2, Mr. Crispo testified that he intended to share *Yorktowne's business information* with Batesville if the transaction was consummated. *See* N.T. 10/25/05, at 159. Section 8.2 provided that "[b]oth parties shall use commercially reasonable efforts to *keep confidential all information* concerning customers, trade secrets, methods, processes or procedures and any other confidential, financial and business information

(the *"Confidential Information"*) *of the other party* with the same standard of care as it uses for its own Confidential Information." *See* 2005 distributor agreement, section 8.2 (emphasis added). Section 8.2 did not prohibit the dissemination of *Yorktowne's* confidential information that the individual shareholders intended to share with Batesville if the transaction was consummated.

¶ 12 Additionally, my review of the 2005 distributor agreement reveals that it contained no provision restricting the individual shareholders' ability to alienate their stock freely. In fact, sections 3.2 (Changes in Ownership) and 3.3 (Right of First Refusal) set forth a specific course of action if change in ownership is either contemplated or achieved.[6] Further, as noted above, Pennsylvania law characterizes alienation as an inherent attribute of corporate stock, and in the absence of a particular restriction, no intent to impose such a restriction will be inferred. *Seven Springs Farm*, at 210, 801 A.2d at 1217. As the individual shareholders did not violate any law or breach the 2005 distributor agreement by entering into the stock purchase agreement with Batesville, I would find that their actions in alienating their stock were not improper as the individual shareholders acted, at least in part, for the purpose of protecting their legitimate interest in the alienability of their stock. As noted above, I find no provision in the 2005 distributor agreement that restrains the individual shareholders from alienating their stock and, in fact, section 3.2 and 3.3 provide options for York in the event of a transfer of ownership. Although this action conflicts with the interests of York, I find the individual shareholders' actions to

be justified based upon the evaluation of the factors enumerated in § 767 Restatement (Second) of Torts. *See Hillis Adjustment Agency, Inc. v. Graham Co.*, 911 A.2d 1008, 1013 (Pa.Super.2006). Therefore, I would find no cause of action exists for intentional interference with a contractual relation because I believe the third element had not been satisfied, and, consequently, I would reverse the grant of preliminary injunctive relief against the individual shareholders. *Reading Radio, Inc.*, 833 A.2d at 211.

¶ 13 Accordingly, I respectfully dissent.

---

**6.** I note that section 3.2 gave York the option of terminating the 2005 distributor agreement immediately without penalty if it was disinterested in, opposed to, or incapable of pursuing a professional relationship with Batesville. Additionally, section 3.3 gave York the option of purchasing the individual shareholders' stock under the terms of shareholders' agreement with Batesville. York declined to exercise either one of the options provided for in the 2005 distributor agreement.