J-A02018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| FIRST NATIONAL TRUST COMPANY D/B/A FNB WEALTH MANAGEMENT | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : : | |
| | : | No. 1109 WDA 2025 |
| STEPHEN G. ENGLISH, BENTON ELLIOTT, JR., ZACHARY A. CRAIG, AND CWA ASSET MANAGEMENT GROUP, LLC D/B/A CAPITAL WEALTH ADVISORS | : : : : : : | |

Appeal from the Order Entered August 19, 2025
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-25-001717

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                **FILED:  February 18, 2026**

First National Trust Company d/b/a FNB Wealth Management (Appellant) appeals from the trial court's order denying its motion for a preliminary injunction, which sought to enforce Appellant's non-solicitation agreements with its former employees, Stephen G. English (English), Benton Elliott, Jr. (Elliott), and Zachary A. Craig (Craig) (collectively referred to as Advisors; or individually, advisor).  Appellant sought a preliminary injunction purportedly to enforce its non-solicitation agreements with Advisors, and to preclude or restrict their employment by CWA Asset Management Group, LLC, d/b/a Capital Wealth Advisors (CWA) (Advisors and CWA collectively referred to as Defendants).  Appellant further challenges the trial court's interpretation

of a provision of Advisors' respective non-solicitation agreements as vague and overly broad. After careful consideration, we affirm.

As described by the trial court,

[Appellant] is a wholly owned subsidiary of First National Bank of Pennsylvania (FNB), which is a federally charged bank with executive offices located in Pittsburgh, Pennsylvania. [Appellant] provides services including private banking, property and casualty insurance and other lending services that differ from those offered by CWA. [Appellant's] headquarters and registered office is located [in] Hermitage, [Pennsylvania]. [Appellant] is [FNB's] investment advisory business that manages clients' investments, among various other functions. [Appellant] has 150-170 employees in its wealth management group. [Appellant] compensates its employees by offering salaries with large incentive-based bonuses. [Appellant] is not registered with [the Financial Industry Regulatory Authority (FINRA)]; however, other FNB subsidiaries are.

Trial Court Opinion, 8/19/25, at 1-2 (punctuation modified).

Defendant CWA

was formed in Naples, Florida in 2004 by William Beynon [(Beynon)] and Blaine Ferguson [(Ferguson)] to provide clients with estate planning services. CWA is a Registered Investment Advisor ("RIA"), offering its clients wealth advisory [services], financial planning, [] estate legacy, [and] asset protection. Currently, CWA has approximately 61 employees. As a small firm, CWA's compensation plan involves splitting fees earned from assets under management between [its financial] advisors and the firm. Beynon and Ferguson are lifelong friends who grew up in Northern West Virginia. CWA has serviced clients in Western Pennsylvania and Northwestern West Virginia for close to a decade. CWA has been licensed to do business as an RIA in Pennsylvania since 2016, in Ohio since 2017, and in West Virginia since 2022. Since 2016, CWA has serviced 25 to 30 clients (with approximately $30 to $40 million in assets under management) in Western Pennsylvania and Northwestern West Virginia.

*Id.* at 3.

**Advisors' Employment With Appellant**

The trial court found that

Craig began working for [Appellant] in February of 2009 [and signed an employment agreement]. He was hired into [Appellant] by David Buckiso and worked a dual role between [Appellant] and First National Bank Investment Advisors ("FNB Investment Advisors"), which was the RIA, and which is registered with FINRA. As a part of his employment, Craig maintained a Series 7 license[, enabling him to sell securities,] in compliance with FINRA regulations….

Craig's father, Kim Craig [(Mr. Craig),] was [Appellant's] Chief Executive Officer [(CEO)] ….

Trial Court Opinion, 8/19/25, at 4 (punctuation modified).

Thereafter, Appellant hired English and Elliott:

English has worked in the financial services industry for more than 30 years, with five different banks. During his 30-year career in wealth management, English has built a client base that consists of close friends and their families, the majority of whom have followed him from bank[ ]to[ ]bank, over a span of decades. For some clients, English has managed multiple generations of their families' assets. In 2012, English was hired by [Mr.] Craig to work in the wealth management department at [Appellant]. On or about February 27, 2012, English signed an Employment Agreement with [Appellant]. ***See*** [Appellant's] Exhibit 1. [Mr.] Craig, [Appellant's] Chief Executive Officer, signed English's Employment Agreement on behalf of [Appellant].

Like English, Elliott has worked in the wealth management business for over 30 years. Immediately prior to joining [Appellant], Elliott worked for Bank of New York Mellon ("BNY Mellon") for more than 18 years as a wealth advisor. Prior to that, Elliott worked at PNC Bank. Throughout his career at PNC Bank and BNY Mellon, Elliott built relationships with individuals who supported and advocated for him and who became his wealth management clients, and his personal friends. Elliott was recruited by [Mr.] Craig to join [Appellant], and he executed an Employment Agreement with [Appellant] on November 21, 2014. ***See*** [Appellant's] Exhibit 2. Elliott testified that he and [Mr.] Craig

negotiated a "carveout" regarding any clients who would follow [Elliott] from BNY Mellon. While [Mr.] Craig did not testify at the hearing [on Appellant' motion for a preliminary injunction,] his designated deposition testimony of March 25, 2025[,] supports the assertion that a memorandum was created regarding the carveout. However, [the memorandum] has subsequently been lost….

The carveout was the culmination of Elliott's discussions with [Mr.] Craig and John Williams [(Williams)], [Appellant's] President, with respect to the clients Elliott was bringing from BNY Mellon to [Appellant]. Specifically, Williams and [Mr.] Craig expressed concern about how BNY Mellon could react to Elliott's resignation and the clients that would move from BNY Mellon to [Appellant]. Elliott testified that:

> Both [] Williams and [Mr.] Craig at the time asked me to take a leap of faith with them to trust that they would memorialize [the carveout] at another time. And it was all done on the basis of wanting to be able to have line of sight on how BNY Mellon was going to respond to my joining [Appellant], that I think more importantly to how they might respond if clients would follow me.

[N.T., 5/21/25, at] 253[.]

*Id.* at 5-7. "English and Elliott were not registered through FINRA as a part of their employment with [Appellant]." *Id.* at 4.

**Advisors' Non-Solicitation Agreements With Appellant**

1. Craig's Non-Solicitation Agreement

Following the execution of his employment agreement with Appellant, Craig signed two non-solicitation agreements with Appellant:

On May 24, 2010, **more than a year after he commenced employment with** [**Appellant**], [Appellant] asked Craig to sign a Non-Solicitation Agreement (the "2010 Agreement"). **The consideration to support signing the 2010 Agreement was Craig's ability to participate in** [**Appellant's**] **Financial Consultant Incentive Plan; however, Craig testified that he**

- 4 -

**had been participating in the incentive compensation plan before he signed the 2010 Agreement.**

Nearly four years later, on February 14, 2014, [Appellant] presented Craig with another Non-Solicitation Agreement (the "2014 Agreement"). **When he was presented with the 2014 Agreement to sign, English, Craig's then[-]direct supervisor[,] informed Craig that if he did not sign the 2014 Agreement, he could not <u>continue to participate</u> in the incentive compensation program.** At that time, the incentive compensation program accounted for 60-70% of Craig's total compensation. The parties dispute whether the $10,000 increase in base salary from 2013 in Craig's 2014 pay was actually consideration for his execution of a new agreement and not just a normal annual raise in base pay. … [T]he 2010 and 2014 non-solicitation agreements with Craig only make reference[,] in the preamble[,] to participation in the incentive program. *See* [Appellant's] Exhibits 3 and 4. **All of these agreements were drafted by [Appellant].**

*Id.* at 4-5 (emphasis added).

2. English's Non-Solicitation Agreement

The trial court provided the following description of Appellant's non-

solicitation agreements with English:

English's Employment Agreement contains certain restrictions in Sections 12, 13, 14, and 15. A two-year period applies to non-competition and non-solicitation restrictions. *See* [Appellant's] Exhibit 1. Among other things, per his Employment Agreement, English is prohibited from (1) disclosing [Appellant's] Proprietary Information, as defined by the Employment Agreement; and (2) accepting a position with a Competitive Enterprise in Allegheny County and any contiguous county for two years after his employment ends. The non-solicitation provision in Section 13(a) prohibits English from soliciting, diverting or enticing any of [Appellant's] "potential customer[s] or business" or "customer[s] or existing business." Section 13(a)(3) does provide an exception to non-solicitation[,] where English would have learned of a potential customer outside the scope of his work at [Appellant] while he was employed there. Section 13(c) of English's Employment Agreement also prohibits him from "employ[ing] or

assist[ing] in employing any present employee of [Appellant] ... for the purpose of having such employee perform services for any Competitive Enterprise..." during the two-year period after his employment with [Appellant] ends. Finally, English's Employment Agreement also contains a "no accept" provision in Section 13(b), which prohibits English from "accept[ing] or provid[ing] any service ... from customers or any potential customers of [Appellant] with whom [English] had contact, involvement or responsibility during the term of this Agreement." The words, "solicit, divert," and "entice" are not defined anywhere within English's Employment Agreement.

*Id.* at 22-23 (footnote omitted).

3. Elliott's Non-Solicitation Agreement

Section 12 of Elliott's employment agreement

prohibits him from working for a Competitive Enterprise "which is located within thirty (30) miles of any [Appellant] office location" for one (1) year after his employment ends, which is also the defined Restrictive Period under his agreement. Section 25 contemplates that the Agreement may be "amended by a written agreement signed by both parties hereto or their duly-authorized representatives." Subsequent to the execution of Elliott's Employment Agreement, [Appellant] and Elliott entered into a supplemental agreement, namely, a carveout to the non-solicitation provision outlined in Section 13 of the Employment Agreement with respect to clients that followed him from BNY Mellon. The evidence established that the carveout was memorialized in writing, although the writing was subsequently lost. … Elliott's agreement does not contain Section 13(a)(3), which is in English's agreement.

*Id.* at 24.

**Advisors' Employment with Appellant**

Throughout most of their employment with Appellant, English reported to Mr. Craig, while Elliott and Craig reported to English. *Id.* at 9. In late 2023 or early 2024, to facilitate Mr. Craig's planned retirement, Appellant discussed

a succession plan. *Id.* According to this plan, English would assume "many of [Mr.] Craig's responsibilities, and [Appellant] would promote Elliott and Craig into supporting executive roles." *Id.*

Appellant subsequently chose not to follow this plan, instead replacing Mr. Craig with David Panneton (Panneton). *Id.* Unfortunately, tensions developed between Advisors and Panneton. *Id.* The trial court found that

> [t]he collective testimony of [Advisors] reflects that they felt that they could not continue to work under [] Panneton's management, and, therefore, they each began searching for new jobs.

*Id.* at 10.

Craig, "who previously knew [CWA's] Beynon, reconnected with him at a West Virginia University football game that same fall …." *Id.* at 11. "[F]ollowing that, an introductory call was scheduled for September 23, 2024[,] with CWA[,] regarding [the] potential acquisition of CWA by [Appellant] and for basic networking." *Id.* CWA declined acquisition by Appellant. Discussions ensued regarding Craig's possible employment with CWA.

**CWA Hires Advisors**

The trial court described CWA's hiring of Advisors:

As is part of CWA's common hiring practices, after the September 30, 2024[,] call, Ferguson and Beynon asked Craig and English to send their then-existing employment agreements to CWA so that CWA could evaluate all potential restrictions. Ferguson testified that it is standard in the industry for an advisor to have, at minimum, a non-solicitation agreement and that CWA takes them very seriously. To further its understanding of [each of Advisors'] restrictive covenants, and to ensure compliance with same, CWA

- 7 -

tasked its Managing Director of Strategic Growth, Pattie Imperial, and later, outside counsel, to analyze the agreements. [Appellant] also follows this practice and routinely requests that employment applicants send [Appellant] their employment agreements to review prior to extending an offer to potential hires.

While discussions were ongoing with CWA, Craig and Elliott happened to have a conversation during a routine call about their common frustrations at [Appellant] under Panneton's management. At that point, Elliott learned that Craig was exploring a position with CWA. After looking at CWA's website, Elliott decided he was also interested in potentially joining [CWA]. By October 11, 2024, CWA had received [Advisors'] employment agreements, and [Advisors] had [each] executed [a] nondisclosure agreement[] with CWA.

*Id.* at 11-12.

In addition to reviewing Craig and Elliott's non-solicitation agreements, CWA sought and prepared "financial modeling to understand [each Advisor's] basic compensation needs." *Id.* at 12. CWA evaluated the general compensation expectations of each of the Advisors. *Id.* However, CWA did not request that Advisors identify their current customers or accounts. *Id.*

Subsequently,

[each advisor] sent basic modeling to CWA consisting of "back of the napkin math" and "rough estimates" of "what a financial advisor with decades of experience" could expect to earn and generate. Based on their "back of the napkin math," [Advisors] each determined that they needed a salary[] of approximately $500,000.00. To "back in" to [Advisors'] respective] compensation needs, CWA relied on industry standard management fees of 1.0%, with the hope that [the Advisors] could each generate $50,000,000 in assets under management (AUM). [Advisors] and CWA generated modeling on a few occasions during the fall of 2024, including during an October 31, 2024[,] in-person "Meet and Greet" at CWA's office in Naples, Florida.

*Id.* at 13.

> On January 20, 2025, Advisors each
>
> executed a memorandum of understanding [] with CWA on January 20, 2025, requiring [each advisor] to strictly adhere to any "lawful legal restrictions" in their respective employment agreements with [Appellant]. Further verbal instruction[s] from CWA included a directive that [Advisors] were to take nothing with them [following their departure from Appellant] and that [Advisors] were not to contact any of their clients or employees of [Appellant], which [Advisors] complied with.

*Id.* at 13-14.

Advisors resigned from Appellant at the end of the workday on January 31, 2025. *Id.* The following Monday, February 3, 2025, Advisors met with CWA and executed their respective employment agreements. *Id.* Presently, Advisors "all currently hold positions at CWA as Managing Directors of Private Wealth Management." *Id.* at 13.

Each advisor "testified that he had not reached out to [Appellant's] clients about their new positions leading up to or following [their] departure from [Appellant.]" *Id.* at 15.

> Rather, if a former client first contacted them, [Advisors] would have the client sign an Acknowledgement of Non-Solicitation ("ANS") affirming that the client had not been solicited by the former [employee of Appellant]. Only after that was signed, did [each advisor] discuss the possibility of moving accounts to CWA. One of Elliott's long-time clients, who had followed him to [Appellant] from BNY Mellon, testified at the hearing and affirmed that this was the process utilized before moving his assets to CWA. The client testified that when traveling with his wife on or about February[] 2025, his wife informed him that Elliott left [Appellant]. She had learned of the departure from Elliott's wife. The client then called Elliott to find out what happened.

*Id.* at 15-16.

Significantly, the trial court also observed that "[m]any of [Appellant's] clients who worked with [Advisors] may have first learned of their departure directly from [Appellant]." *Id.* at 16. Panneton testified that Appellant's employees reached out to Appellant's "at risk" clients "within 24 hours" of Advisors' resignations. *Id.* During some of these phone calls, the clients immediately notified Appellant that their accounts would be following their respective advisor. *Id.* Panneton further conceded that "word gets out very quickly" in the Johnstown and Erie markets. *Id.*

**The Preliminary Injunction Motion**

On February 18, 2025, Appellant filed a Complaint against Advisors. Complaint, 2/18/25. That same day, Appellant filed a motion for a preliminary injunction (PI Motion against Defendants, which is the subject of this appeal. PI Motion, 2/18/25. In their PI Motion, Appellants claimed that Advisors engaged in a "calculated plan" to simultaneously depart from their employment with Appellant to join CWA, Appellant's competitor. *Id.* ¶ 2. Appellant claimed that in doing so, Advisors disregarded the express terms of their employment and non-solicitation agreements. *Id.* ¶ 3. Appellant further claimed that CWA, knowing of Advisors' respective non-solicitation agreements with Appellant, tortiously interfered with Appellant's employment contracts, "and conspired with [Advisors] to breach their contractual obligations and unfairly compete with [Appellant] in a coordinated raid of

[Appellant's] top sales team as CWA enters the Pennsylvania, West Virginia, and Ohio markets." *Id.* ¶ 4. Appellant filed its PI Motion

> to stop Defendants' brazen disregard of obligations owed to [Appellant] and to protect [Appellant's] relationships with its clients and, in particular, to order [Advisors] to stop their ongoing breaches and cease Defendants' unfair competition.

*Id.* ¶ 5. On March 11, 2025, Defendants filed a brief opposing Appellant's PI Motion. Defendant's Opposition Brief, 3/11/25.

The trial court conducted hearings on Appellant's PI Motion on May 22, 2025, and May 28, 2025, after which the parties submitted proposed findings of fact and conclusions of law. On August 19, 2025, the trial court denied Appellant's PI Motion by an opinion and order. Trial Court Opinion and Order, 8/19/25. Thereafter, Appellant filed the instant timely appeal. The trial court did not direct Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Appellant presents the following issues for our review:

1. Whether the trial court abused its discretion in its assessment of the adequacy of consideration to find that [Craig's 2010 Agreement] and 2014 [Agreement] were unenforceable[?]

2. Whether the trial court abused its discretion in its analysis of the English, Elliott, and Craig [non-solicitation agreements] by (1) improperly limiting the definition of "solicit" only to mean "initiate contact" in the Non-Solicitation Provisions; (2) failing to address the contractual language prohibiting English, Elliott, and Craig from "divert[ing]" or "entic[ing]" customers away from [Appellant]; (3) ignoring the contractual restrictions that prevent English, Elliott, and Craig from soliciting other employees, including each other; and (4) finding that English, Elliott, and Craig did not provide, and CWA did not use, [Appellant's] confidential and proprietary information against

- 11 -

the clear and unambiguous language of the contractual restrictions[?]

3. Whether the trial court abused its discretion by misapplying Pennsylvania law addressing the coordinated "lift out" from [Appellant] of English, Elliot[t], and Craig to CWA, a competitor[?]

4. Whether the trial court abused its discretion in its analysis of the Elliott and English employment agreements by (1) failing to enforce the plain language of [the] English and Elliott agreements prohibiting them from "accepting" [Appellant's] customers or "providing assistance" to a competitor; and (2) misapplying Pennsylvania law to find the language in Section 13 of the non-solicitation provision as "vague and far too broad"[?]

5. Whether the trial court abused its discretion by finding that a carve-out to Elliott's non-solicitation provision existed where there is no evidence of a writing signed by both parties to memorialize the alleged carve-out[?]

6. Whether the trial court abused its discretion by misapplying Pennsylvania's standard for a preliminary injunction when [Appellant] sought a preliminary injunction based on its likelihood of success on its claims for breach of contract, unfair competition, tortious interference with existing and/or prospective business relationships, misappropriation of trade secrets, and civil conspiracy, but the trial court only addressed [Appellant's] breach-of-contract claim[?]

Appellant's Brief at 5-7 (issues renumbered; capitalization modified).

Appellate review of a ruling on a preliminary injunction is highly deferential. ***CKHS, Inc. v. Prospect Med. Holdings, Inc.***, 329 A.3d 1204, 1211 (Pa. 2025).

Appellate courts review an order … denying a preliminary injunction to determine whether the trial court abused its discretion. … [**W**]**e do not inquire into the merits of the controversy, but only examine the record to determine if there were *any apparently reasonable grounds* for the**

**action of the court below.**  An appellate court will not interfere with the trial court's order unless it is clear that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied ….

*Id.* at 1211 (emphasis added; quotation marks, citations and footnote omitted).  As our Supreme Court has cautioned,

[i]t is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally[,] in such an issue[,] we are not in full possession of the case either as to the law or testimony—**hence our almost invariable rule is to simply affirm the decree, or if we reverse it**[,] **to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity**.

*Id.* at 1211-12 (emphasis added; citation omitted).

"As in all equity matters, … we must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence."  ***Oberholzer v. Galapo***, 322 A.3d 153, 210 (Pa. 2024) (citation omitted).  Finally, our scope of review in preliminary injunction matters is plenary.  ***CKHS, Inc.***, 329 A.3d at 1213 n.2 (citation omitted).

The six essential prerequisites that a moving party must demonstrate to obtain a preliminary injunction are as follows:

(1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending

- 13 -

activity; and, (6) the preliminary injunction will not adversely affect the public interest.

**SEIU Healthcare Pa. v. Commonwealth**, 104 A.3d 495, 501-02 (Pa. 2014) (citations omitted).

In this case, the challenged restrictive covenant is in the context of an employment agreement. "Pennsylvania courts have historically viewed such covenants as contracts in restraint of trade that prevent a former employee from earning a livelihood, and, therefore, have disfavored such provisions in the law." **Socko v. Mid-Atlantic Sys. of CPA, Inc.**, 126 A.3d 1266, 1273-74 (Pa. 2015) (citations omitted).

> Currently in Pennsylvania, restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer.

**Id.** at 1274 (citations omitted). Covenants not to compete are strictly construed against the employer. **All-Pak, Inc. v. Johnston**, 694 A.2d 347, 351 (Pa. Super. 1997).

Our Supreme Court has long recognized an employer's right to protect its interest in customer relationships acquired through the efforts of its employees:

> The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. **Certainly, the argument goes, the employee should have no equity in the custom[ers] which the business had developed <u>before</u> he was employed.**

> **Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal.** This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cash-box.

*John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1168 (Pa. 1977) (emphasis added; footnotes and some quotation marks omitted).

With this in mind, we review the issues raised by Appellant.

**1. Whether the trial court abused its discretion in its assessment of the adequacy of consideration to find that the Craig 2010 and 2014 non-solicitation agreements were unenforceable.**

Appellant first challenges the trial court's determination that Craig's 2010 Agreement and 2014 Agreement are unenforceable for lack of consideration. Appellant's Brief at 78. Appellant claims there is record evidence "establishing at least two independent, concrete forms of 'new and valuable' consideration." *Id.* at 80. According to Appellant, "eligibility for and participation in [the] incentive compensation [plan] constitutes consideration." *Id.* Appellant states that the employees who declined to sign a non-solicitation agreement "were ineligible to participate in incentive compensation plans." *Id.*

> Non-signers would not have access to substantial incentive compensation, and would forego the opportunity to earn approximately 60-70% more in overall compensation. That benefit is not theoretical or nominal; it is a material economic benefit conferred by signing.

*Id.*

Appellant asserts that in 2014, Craig became eligible to participate in a new compensation plan, which replaced the prior plan, and "in addition, he received a base salary increase of more than $10,000 over his prior base pay." *Id.* Appellant argues that these changes are sufficient to establish "new and valuable" consideration to support the 2014 Agreement. *Id.* at 81. Appellant also asserts that it conditioned Craig's eligibility for incentive compensation upon his execution of the restrictive covenant. *Id.* at 82. According to Appellant, the trial court improperly failed to credit the fact that Craig received a $10,000 base salary increase and became eligible for a new, more lucrative performance compensation plan. *Id.* at 83-84. Appellant claims the trial court "speculated" that the 2014 salary increase might have been a customary cost-of-living increase. *Id.* at 84. According to Appellant, the trial court erred in requiring Appellant to disprove this "conjecture." *Id.*

Defendants disagree, pointing out Craig's undisputed testimony that he was participating in the incentive plan prior to being asked to sign the 2010 Agreement. Appellees' Brief at 43. Regarding the 2014 Agreement, Defendants assert that "[b]ased on the plain language of the document, … the purported consideration for that agreement was Craig's *continued participation* in the incentive compensation plan." *Id.* (emphasis added). According to Defendants, the trial court properly denied Appellant's attempt to use parol evidence to rebut the language of the agreement, *i.e.*, a paystub

suggesting that Craig received an annual raise in base pay from 2013-2014.

*Id.* at 43-44. Defendants state,

> the trial court noted that [Appellant] "does not recite new additional consideration, and the Court cannot assume that the additional $10,000 in base pay was anything other than a customary cost of living or other step up in salary that would have happened regardless of the execution of a new non[-]solicitation agreement."

*Id.* at 44 (citation omitted).

To be valid, a covenant not to compete must be consummated with the exchange of consideration. *Socko*, 126 A.3d at 1274-75; *see also Capital Bakers Inc. v. Townsend*, 231 A.2d 292, 293-94 (Pa. 1967) (concluding that a restrictive covenant in an employment contract executed 12 years after the start of employment was unenforceable for lack of consideration).

> When a non-competition clause is required after an employee has commenced his or her employment, it is enforceable only if the employee receives "new" and valuable consideration — that is, some corresponding benefit or a favorable change in employment status. Sufficient new and valuable consideration has been found by our courts to include, *inter alia*, a promotion, a change from part-time to full-time employment, or even a change to a compensation package of bonuses, insurance benefits, and severance benefits. **Without new and valuable consideration, a restrictive covenant is unenforceable.** More specifically, the mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party.

*Socko*, 126 A.3d at 1275 (footnotes and citations omitted; emphasis added).

Here, the trial court found that Craig's 2010 Agreement and 2014 Agreement were not supported by new and valuable consideration:

[Appellant] failed to demonstrate that there was adequate consideration for the covenants of the 2014 Agreement. [The 2014 Agreement] does not recite new additional consideration, and **the court cannot assume that the additional $10,000 in base pay was anything other than a customary cost of living [adjustment] or other step up in salary that would have happened regardless of the execution of a new non-solicitation agreement.** Similarly, *the basis for enforcement of the 2010 non-solicitation agreement is also not clear from the record[,] as there was no evidence to contradict Craig's assertion that he was already participating in the performance compensation program since his hiring in 2009.* No reason was provided for why a non-solicitation agreement was signed more than a year after Craig began working with [Appellant]. At this time, [Appellant] has not demonstrated that Craig's 2010 or 2014 restrictions are enforceable ….

Trial Court Opinion, 8/19/25, at 21-22 (emphasis added; capitalization modified).

Upon review, we conclude the trial court had "apparently reasonable grounds" for denying Appellant's PI Motion as to Craig. *CKHS, Inc.*, 329 A.3d at 1211. The trial court reasonably determined, based on the record before it, that Craig's continued participation in the performance compensation program, and increase in base pay, did not constitute new and valuable consideration. *See Socko*, 126 A.3d at 1275. Consequently, Appellant's first issue merits no relief.

**2. Whether the trial court abused its discretion in its analysis of the English [and] Elliott [non-solicitation agreements].**

In its second issue, Appellant argues that the trial court "improperly interpreted 'solicit' in the non-solicitation provision." Appellant's Brief at 34 (capitalization modified). Appellant takes issue with the trial court's

- 18 -

interpretation of Section 13, *i.e.*, the non-solicitation clause of its employment agreements with Elliott and English.[1]  *Id.* at 35.  Section 13 provides as follows:

**SECTION 13 Non-Solicitation.**

During the Restricted Period the Officer shall not

**(a)**  In any way, directly or indirectly, for the purpose of selling any product or service that competes with a product or service offered by [Appellant] or its present or future subsidiaries or affiliates, solicit, divert, or entice:

**(1)**  any customer or existing business of [Appellant], with whom the Officer solicited, became aware of, or transacted business during the Officer's employment with [Appellant];

**(2)**  any potential customer or business identified by [Appellant], with whom the Officer solicited, became aware of, or transacted business during Officer's employment with [Appellant;]

**(b)**  accept or provide assistance in the accepting of (including, but not limited to providing any service, information, assistance or other facilitation or other involvement) business, patronage or orders from customers or any potential customers of [Appellant] with whom the Officer has had contact, involvement or responsibility during the term of this Agreement;

**(c)**  employ or assist in employing any present employee of [Appellant] or its affiliates …, for the purpose of having such employee perform services for any Competitive Enterprise or other organization in competition with the business of

---

[1] Because the trial court reasonably determined that Craig's non-solicitation agreements were unsupported by adequate consideration, we need not address Appellant's arguments related to the Craig non-solicitation agreements.

[Appellant] or any of its present or future subsidiaries or affiliates;

**(d)** in any way, directly or indirectly, make any oral or written statement, comments, or other communications designed or intended to impugn, disparage or otherwise malign the reputation, ethics, competency, morality or qualifications of [Appellant] or any of its directors or employees or customers.

*See* Appellant's Exhibit A, ¶ 38 (capitalization and punctuation modified).

Relying on the definition of "solicitation" provided in Black's Law Dictionary, Appellant argues that the trial court erred in interpreting the word "solicitation" as requiring that the Advisors "initiate contact" with the potential customer. Appellant's Brief at 38. Appellant contends that, "[u]nder Pennsylvania's plain-meaning approach, a court will not read into a non-solicitation provision 'initiate contact' language where the contractual language does not include those words." *Id.* Appellant directs our attention to a federal district court case wherein the court refused to read the words "initiate contact" into the definition of "solicit." *Id.* (citing *Syntes, Inc. v. Eerge Med., Inc.*, 25 F. Supp. 3d 617, 691 (E.D. Pa. 2014)).

Appellant argues that the trial court improperly limited the term "solicitation" with the words "initiate contact," as these words are not included in the Elliott and English non-solicitation agreements. *Id.* at 40, 41. Appellant argues that English and Elliott were prohibited from directly or indirectly,

> for the purpose of selling any product or service that competes with those offered by [Appellant], "solicit[ng], divert[ing], or entic[ing]" any customer or potential customer that they solicited,

- 20 -

became aware of or transacted business with during their time at [Appellant].

*Id.* at 44. Appellant argues that the trial court additionally ignored the prohibition against diverting or enticing Appellant's customers. *Id.* at 45.

Defendants counter that the trial court properly construed the employment agreements to prohibit only affirmative and intentional acts of solicitation, and correctly found that no solicitation occurred. Appellees' Brief at 18. According to Defendants, they presented "uncontroverted evidence that [Advisors] did not initiate contact with any former [Appellant] client." *Id.* at 19. Defendants assert Appellant "failed to bring forth any client testimony to support its claims that [an individual advisor] violated the non-solicitation provisions in their Employment Agreements." *Id.* at 20.

Our Supreme Court has recognized:

In interpreting the language of a contract, [the reviewing court] attempt[s] to ascertain the intent of the parties and give it effect. When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, which will be given its commonly accepted and plain meaning....

*LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) (citations omitted); *accord Doe v. Cheesecake Factory*, 300 A.3d 1070, 1075 (Pa. Super. 2023).

The dictionary defines "solicit," in relevant part, as "to approach (someone) with a request or plea"; "to make petition to: entreat"; and "to try to obtain (something) by usually urgent requests or pleas[.]"

https://www.merriam-webster.com/dictionary/solicit (last accessed Jan. 15, 2026). According to Appellant,

> the 2019 version of Black's Law Dictionary defines "solicitation" to mean "[t]he **act** or an instance of **requesting** or **seeking** to obtain something; a request or petition or "[a]n attempt or effort to gain business." BLACK'S LAW DICTIONARY (11th ed. 2019)....

Appellant's Brief at 37 (emphasis added).

The dictionary defines "divert" as "to turn from one course or use to another." https://www.merriam-webster.com/dictionary/divert (last accessed January 15, 2026). The dictionary defines "entice" as "to attract artfully or adroitly or by arousing hope or desire[.]" https://www.merriam-webster.com/dictionary/entice (last accessed January 15, 2026).

Significantly, the terms "solicit", "divert," and "entice" are verbs, with each requiring an affirmative act. Our review confirms that Appellant presented no evidence that Elliott or English took any affirmative action to solicit, divert or entice any of Appellant's customers. As the trial court explained, Advisors "all testified that they had not reached out to clients about their new positions leading up to or following [their] departure from [Appellant]." Trial Court Opinion, 8/19/25, at 15.

> [T]he record demonstrates that [Advisors] did not initiate contact with clients, but that **clients obtained knowledge of** [**Advisors'**] **employment by other means, including by** [**Appellant**] **contacting clients in the days immediately after** ... **English**[] **and Elliott resigned**. At this juncture, [Appellant] has not demonstrated that [Advisors] solicited [Appellant's] clients in violation of any reasonable restrict[ion] contained in their respective agreements. [Appellant] also has not established that CWA requested or condoned any action on the part of

[Advisors], which would have violated their duties under their agreements with [Appellant]. Under the circumstances of this case, where [D]efendants are conducting themselves with proper regard for reasonable restrictions in [Advisors'] employment agreements, injunctive relief is not appropriate.

*Id.* at 25-26 (emphasis added). Based on the foregoing, we conclude the trial court's interpretations of the terms solicit, divert, and entice are reasonable, as is its conclusion that Advisors did not violate the terms of their respective agreements on this basis.

Appellant also argues that the trial court ignored the plain language of the non-solicitation provisions, which prevented each advisor from soliciting other employees of Appellant, including each other. Appellant's Brief at 47. According to Appellant, Advisors violated the prohibition against employing or assisting in CWA's employment of Appellant's employees. *Id.*

[Advisors] all admitted to discussing with each other [a] plan to leave [Appellant] for CWA as a "team." Indeed, Craig first solicited English to join him in the CWA discussions, and then, together, Craig and English jointly solicited Elliott to depart [Appellant] with them. None of the [Advisors]—all of whom were highly compensated leaders and managers—disclosed or reported the other [Advisors'] discussions with CWA or solicitation of the other [Advisors] to anybody at [Appellant] at any point during or after September 2024.

*Id.* at 48. Again, Appellant argues the plain language of the non-solicitation agreements prohibited such conduct. *Id.* at 49. The record does not support Appellant's argument.

In his deposition, Elliott testified that he first spoke with Craig about CWA on September 27, 2024. N.T. (Elliott Deposition), 4/8/25, at 81. Elliott

indicated that at the time, he "was at a point of extreme … frustration" when working with Panneton. *Id.* at 84. In that call, Elliott "unloaded about my continual frustration with [] Panneton, to the point that" Elliott indicated his imminent intention to leave his employment with Appellant. *Id.* at 85. Craig indicated "he was considering leaving, … and shared the name of [CWA with Elliott], and said you should go check out their website." *Id.* at 86.

Elliott further confirmed that he spoke with an employment placement agency frequently. *Id.* at 87. According to Elliott, he interviewed with Fifth Third Advisors and had two informal discussions with another bank. *Id.* at 88. Elliott subsequently contacted Craig and asked to be involved in "any discussions with CWA, so that I could learn more about them." *Id.* at 89. Craig later informed Elliott about a scheduled meeting with CWA in October 2024, in Naples, Florida. *Id.* at 90, 92.

Elliott indicated that he signed a mutual confidentiality agreement with CWA. *Id.* at 97. According to Elliott, he was concerned about statements he made regarding Panneton, and what would happen if "some left" Appellant and "some didn't[.]" *Id.* at 96. Elliott indicated CWA's intention to treat Craig, English, and Elliott as a "team" that would "share equally in thirds" revenue attributable to the team. *Id.* at 153.

English testified regarding his employment at Appellant:

> I was not unhappy at all at [Appellant]. In fact, my career would have ended there, and … I was fairly compensated and very, very, very happy, … until I started getting bullied, harassed, abused.

….

> … I think my health suffered because of how I was treated by [] Panneton.

N.T. (Deposition of English), 4/2/25, at 169 (paragraph formatting modified). According to English, Panneton would "pit people against other people." *Id.* at 171. Although English had intended to retire from Appellant, "I was forced into a decision to get out." *Id.* English testified that

> I tried to go … back to [Panneton] and say, [] can we just bury the hatchet and start working, you know, better?
>
> [Panneton] literally did not want to do that. I don't know what is in his mind. … [S]o I left, because he didn't like me, and he was upset about some emails that he read about [Mr. Craig] early on, or he just is the meanest guy I have ever met in my life.
>
> So, one or the other, but I don't have to put up with that, nor should anybody else have to put up with that.

*Id.* at 172. English testified that he made the decision to join CWA about a month prior to terminating his employment with Appellant. *Id.* at 173. English testified that he repeatedly tried to remain at Appellant and "did not want to go." *Id.* However,

> [t]here was a day that [Panneton] screamed at me in front of 12 or 15 executives, and that might have been a day that put me closer to the edge.
>
> And I asked [Panneton] … in private a couple days later, if he would please not do that to me, because I used to be … his top guy.
>
> [Panneton] hired me, and then all of a sudden he goes … there is the fucking door. I'm like, holy shit, what is going on? And I'm thinking, okay, I think Panneton is submarining me.

*Id.* at 173-74.

English confirmed that that he decided to leave Appellant around August of 2024. *Id.* at 177. English first spoke with CWA regarding Appellant's potential purchase of CWA. *Id.* at 179. English explained,

> [t]he whole effort was for me to introduce [Appellant to CWA] and our appetite to grow into the Florida market, possibly through acquisition, and potentially to see if [Appellant] had interest in partnering up and possibly buying [CWA].

*Id.* at 185. According to English, he later considered CWA as a "potential place for me to go." *Id.* at 187.

> The trial court found that

> [t]he collective testimony of [Advisors] reflects that they felt that they could not continue to work under [] Panneton's management, and, therefore, they each began searching for new jobs.

Trial Court Opinion, 8/19/25, at 10. While Advisors engaged in discussions with CWA, there is no evidence that any individual advisor solicited, assisted or enticed another advisor to leave Appellant. Instantly, the trial court's denial of the PI Motion is reasonable, where the evidence established that each advisor made an independent decision to leave Appellant for CWA.

**3. Whether the trial court abused its discretion by misapplying Pennsylvania law addressing CWA's coordinated "lift out" of [Advisors] from [Appellant], a competitor.**

Appellant next argues that the trial court misapplied Pennsylvania law in addressing whether CWA coordinated a "lift out" of [Advisors] from [Appellant], a competitor." Appellant's Brief at 56. According to Appellant,

the trial court misinterpreted this Court's decision in **Bert Co. v. Turk**, 257 A.3d 93 (Pa. Super. 2021), **affirmed**, 298 A.3d 44 (Pa. 2023).

Appellant argues that in **Turk**, this Court identified various indicia of a "lift-out" that violates Pennsylvania law. Appellant's Brief at 59. Comparing the instant case to **Turk**, Appellant points to evidence that Advisors had secret meetings with CWA; Advisors compiled revenue projections before leaving Appellant; Advisors shared confidential and proprietary information with CWA at CWA's request; Advisors concealed the "lift out" by using relatives' email addresses and phone numbers for communications, and deleting evidence of those communications; and that Craig solicited English and Elliott in coordination with CWA. **Id.** at 59-60.

Our Supreme Court described the underlying facts in **Turk** as follows:

The Bert Company, [d/b/a] Northwest Insurance Services ("Northwest"), is an insurance brokerage firm with clientele in northwestern Pennsylvania and western New York. In 2017, Northwest realized gross earnings of $9.4 million. Beginning in 2005, Matthew Turk ("Turk") was employed as an insurance broker with Northwest. In 2009, he became head of the property and casualty division, and then worked as senior vice president of that division from January 2013 until his departure in May 2017. First National Insurance Agency, LLC ("FNIA") is an insurance brokerage firm. FNB Corporation is the parent company of [FNB] and FNIA (collectively and with FNIA "First National").

In 2016, FNIA had only a minor market share in northwestern Pennsylvania. To grow its business in that region, First National developed a plan to takeover Northwest, initially by convincing key Northwest employees to leave Northwest for FNIA and to bring their clients with them. These employees were under non-solicitation agreements with Northwest. First National initiated this plan, which it referred to as "lift out," beginning in the fall of 2016 by covertly meeting with Turk. The ultimate goal, however,

- 27 -

was not only the acquisition of certain key employees and their books of business but the takeover of Northwest at a fire sale price.

Through the fall and winter of 2016, Turk repeatedly met with First National about the plan with the hope that First National could gut Northwest by hiring the bulk of its highest producers, acquiring their clients, and ultimately forcing that company to sell its remaining book of clients to First National. This course of conduct included Turk providing First National with sensitive pieces of Northwest's data, such as his book of business and a list of profitable employees that Turk believed would be willing to leave Northwest to work for First National. Turk's interactions with First National included various correspondence with two Senior Vice Presidents of FNB regarding the plan to raid Northwest.

*Bert Co. v. Turk*, 298 A.3d 44, 49 (Pa. 2023).

During this time period, Turk and William Collins (Collins) provided their non-solicitation agreements to First National. *Id.* However, Turk then asked Northwest for a new non-solicitation agreement with a duration of one year, rather than three years. *Id.* Northwest agreed. *Id.*

Correspondence and multiple meetings occurred among various representatives of First National and Northwest employees regarding the takeover of Northwest; **all the while Turk attempted to undermine Northwest's operations**….

*Id.* at 50 (emphasis added). In addition, other employees were instructed and took action to conceal Turk's actions in soliciting employees from Northwest. *Id.*

Toward the middle of May 2017, the plan began to come to fruition as several Northwest employees resigned and accepted offers from First National. Pursuant to the plan, Turk remained at Northwest to convince the company to sell its remaining business to First National. Northwest refused, choosing instead to fire Turk and initiate legal action.

*Id.*

Following a trial, the jury entered a verdict in favor of Northwest for compensatory and punitive damages. *Id.* at 51. This Court affirmed, and our Supreme Court affirmed the calculation and award of damages.

Instantly, in discussing *Turk*, the trial court stated,

[Appellant] has not demonstrated a clear right to relief. First, it did not demonstrate that [Advisors] provided CWA with proprietary information or improperly retained or misused proprietary information in any way. … This is in no way analogous to [*Turk*,] the case cited by Appellant in which a sister company to [Appellant] and the parent company, FNB, were found to be found liable by a jury for a hostile takeover attempt through a "lift out" scheme. [*S*]*ee* … *Turk*[,] *supra* (Wherein Defendant Turk provided detailed client information in advance of being hired by the FNB insurance subsidiary).

[Advisors] and CWA's principal[,] Ferguson[,] all testified that CWA directed [Advisors] not to bring anything with them [following their departure from Appellant,] and not to solicit clients in violation of their respective agreements. [**Appellant**] **did not present evidence that contradicted these statements**.

[Appellant] also did not establish that [English and Elliott] are out of compliance with the geographic limitations of their respective employment agreements signed with [Appellant]….

Finally, the record demonstrates that [Advisors] did not initiate contact with clients, but that clients obtained knowledge of [Advisors'] employment by other means, including by [Appellant] contacting clients in the days immediately after Craig, English, and Elliott resigned. … [Appellant] also has not established that CWA requested or condoned any action on the part of [Advisors], which would have violated their duties under their [respective] agreements with [Appellant]. Under the circumstances of this case, where [Advisors] are conducting themselves with proper regard for reasonable restrictions in their employment agreements, injunctive relief is not appropriate.

Trial Court Opinion, 8/19/25, at 24-26.

Our review confirms the lack of evidence of misconduct by Advisors against Appellant. While certain Advisors may have hidden evidence of their intention to leave Appellant's employment, it is not in any way comparable to the nefarious actions undertaken by the Turk. Under these circumstances, the trial court's denial of the PI Motion based upon the alleged "lift out" of Advisors by CWA was reasonable.

**4. Whether the trial court abused its discretion in its analysis of the Elliott and English employment agreements by (1) failing to enforce the plain language of [the] agreements prohibiting them from "accepting" [Appellant's] customers or "providing assistance" to a competitor; and (2) misapplying Pennsylvania law to find the language in Section 13 of the non-solicitation provision as "vague and far too broad."**

Appellant argues that the trial court erred in concluding that Section 13(b) of the English and Elliott non-solicitation agreements is unenforceable as vague and overbroad.[2] Appellant's Brief at 62. Appellant disagrees with the trial court's finding that Section 13(b)

_____

[2] As described in Appellant's brief, Section 13(b) provides that during the restrictive period, the advisor is not permitted to

> accept or provide assistance in the accepting of (including, but not limited to providing any service, information, assistance or other facilitation or other involvement) business, patronage or orders from customers or any potential customers of [Appellant] with whom the [advisor] has had contact, involvement or responsibility during the term of this Agreement.

Appellant's Brief at 62 (citation and emphasis omitted, capitalization modified).

was "overly broad" and "vague" because 1) the phrase "potential customers … lack[s] confine[s]" and 2) "unduly restricts movement in long-term relationships such as friends and family."

*Id.* at 62-63 (citation omitted).

Appellant argues the plain language of the provision restricts the scope of the non-solicitation to "any potential customers of [Appellant] **with whom the** [**advisor**] **has had contact, involvement or responsibility** during the term of this Agreement."  *Id.* at 63 (citation omitted; emphasis in original). Appellant claims this language clearly limits the scope of potential customers. *Id.*

Appellant also argues that the trial court failed to analyze the provision under the framework provided in *Hess v. Gebhard & Co.*, 838 A.2d 912 (Pa. 2002).[3]  Appellant's Brief at 65.  Appellant asserts the length of the restriction is reasonable, and reasonably limited in geographic scope.  *Id.* at 66-67. Further, Appellant claims that even if the trial court considered the restriction

_____

[3] In *Hess*, our Supreme Court stated that restrictive covenants are enforceable if they are

> incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent.  Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer.

*Hess*, 808 A.2d at 917 (quotation marks and citations omitted).

to be "overly broad," the court should have "equitably modified the provision instead of invalidating it entirely." *Id.* at 68.

Defendants disagree, first pointing out that the <u>non-solicitation provision</u> in Advisors' respective employment agreements have no geographic scope.[4]  Appellees' Brief at 35.  Defendants assert that as written, Section 13(b) would prohibit Defendants from accepting any business from "any former client—including family members and personal friends—anywhere in the world."  *Id.* at 36.

In its opinion, the trial court found that

[Appellant] … did not establish that [English and Elliott] … are out of compliance with the geographic limitations of their respective employment agreements signed with [Appellant].  [Appellant's] requested relief in the proposed order, which would prohibit either of them from working for CWA at all for one year, is overly broad and inconsistent with the language of the non-competition provisions.

Trial Court Opinion, 8/19/25, at 25.  Further, the trial court determined that the prohibition, "not accept or provided assistance" is "overly broad."  *Id.* at 22.  Regarding the solicitation of "potential customers" with whom Advisors had contact, the trial court concluded the provision "lacks [geographic] confines and unduly restricts movement in long-term relationships such as friends and family of [Advisors]."  *Id.* at 23 n.6.  In the context of this appeal, we agree.

_____

[4] Defendants acknowledge the non-compete provisions included a geographic limitation.  Appellees' Brief at 35.

Initially, our review of the non-solicitation clause of Appellant's employment agreements with English and Elliott confirms the lack of any geographic scope. *See* Complaint, 2/18/25, exh. 1. Thus, the non-solicitation clause is unenforceable as written. *See Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021) (recognizing that restrictive covenants are enforceable "only if … the restrictions are reasonably limited in … geographic extent[.]").

In addition, our review discloses that English and Elliott each testified regarding pre-existing customers, friends, and family that followed them from their prior employment situations to their employment with Appellant. Besides these customers, Appellant presented no evidence of other customers (or potential customers) who followed Advisors from Appellant to CWA. Keeping in mind that Pennsylvania law disfavors restrictive covenants, *see Socko*, we conclude that it would be unreasonable to include the customers of Advisors, whose relationships predated each advisor's employment with Appellant. Appellant neither subsidized nor financially supported the establishment of each customer's relationship with their respective advisor. *See Hess*, 808 A.2d at 917 (requiring that to be enforceable, the restrictions imposed by a restrictive covenant must, *inter alia*, be reasonably necessary for the protection of legitimate interests of the employer). In addition, as the trial court observed,

> Pennsylvania Courts have recognized that the restraint on liberty extends to "customers [who] naturally will follow the employee to

the new employer, rather than remain customers of the former employer. An injunction will not make [Appellant] patrons of those who desire to go elsewhere." ***Renee Beauty Salons v. Blose-Venable***, 652 A.2d 1345, 1349 (Pa. Super. 1995).

> As noted by the trial court, by the majority, and by prior Pennsylvania cases, there are certain client-oriented employments that tend to breed individual loyalty. ***See, e.g., Spring Steels, Inc. v. Molloy***, … 162 A.2d 370, 375 ([Pa.] 1960) ("[I]t is inevitable … where [a] former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association."); ***accord Renee Beauty Salons*** …. Speaking generally, it is not the law's place to interfere with free commerce of this sort.
>
> ***PTSI, Inc. v. Haley***, 71 A.3d 304, 319-20 (Pa. Super. 2013) ([Judge] Wecht, concurring opinion) (affirming granting of summary judgment in favor of former employees of a physical training facility).

Trial Court Opinion, 8/19/25, at 27-28. The trial court's rationale and determination are reasonable.

Finally, our review discloses that Appellant presented no evidence that Advisors solicited, diverted, or enticed *any* of Appellant's other customers to leave Appellant for CWA. The trial court's determination is supported in the record and reasonable.

**5. Whether the trial court abused its discretion by finding that a carve-out to Elliott's non-solicitation provision existed where there is no evidence of a writing signed by both parties to memorialize the alleged carve-out.**

Appellant next argues that the trial court improperly found that a "carve-out" of Elliott's preexisting customers existed, in the absence of a signed writing by both parties. Appellant's Brief at 70. Appellant points out Section

25 of Elliott's employment agreement, which provides that the agreement may only be amended by a written agreement signed by both parties or their representatives. *Id.* Appellant argues that the trial court ignored this provision when it found that a carve-out had been executed between the parties. *Id.* Appellant argues that the trial court's findings are not supported by the evidence and based on a "clear error of law." *Id.* at 71.

Appellant contends the integration clause of the employment agreement controls, and precludes attempts to modify the agreement through parol evidence. *Id.* at 72. Because the employment agreement requires a signed writing for modification, Appellant claims that reliance on an alleged "oral understanding" is foreclosed. *Id.* at 72-73. According to Appellant, the record contains no competent evidence of a signed agreement regarding the "carve-out." *Id.* at 73. Appellant points out that Elliott's resignation letter did not refer to this carve-out. *Id.* at 74.

Appellant argues that, in determining that the carve-out agreement exists, the trial court misapplied the parol-evidence and best-evidence rules. *Id.* Appellant claims that the trial court cannot establish a valid amendment to the agreement, to include a carve-out, as a matter of law. *Id.*

Defendants dispute Appellant's assertion, arguing that the trial court's determination regarding the existence of a written "carve-out" agreement is supported by the testimony of Elliott; the testimony of Mr. Craig; a carve-out memorandum memorializing the carve-out; and the testimony of Appellant's

counsel, who indicated that other employees have similar carve-outs. *Id.* at 40. Defendants further point out that "the document is missing because [Appellant] failed to preserve it in Elliott's personnel file." *Id.* at 41.

This Court has summarized the parol evidence rule and its application in this context as follows:

> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake. In addition, where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004).

However, our Supreme Court has recognized that "the parol evidence rule bars only prior or contemporaneous oral agreements, not subsequent ones." *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968). "[W]here a written contract is modified by subsequent conduct of the parties, … the extent of the modification must be shown by clear and convincing evidence." *Berwick v. Daniel W. Keuler Realtors, Inc.*, 595 A.2d 1272, 1275 (Pa. Super. 1991)

As the trial court observed in its opinion, Elliott testified that Appellant's then-CEO, Mr. Craig, and Appellant's president, Williams, asked him to trust that following execution of the employment agreement, a carve-out would be

negotiated. Trial Court Opinion, 8/19/25, at 7 (citing N.T., 5/21/25, at 253). The trial court acknowledged Elliott's testimony about the subsequent carve-out agreement he executed with Appellant, and that it was in writing.[5] *Id.* at 8. *See also* N.T. (PI Motion Hearing), 5/21/23, at 258-59 (Elliott testifying that 15-18 months after his hiring by Appellant, he and Appellant executed a written carve-out agreement regarding clients brought from BNY Mellon to Appellant). We discern no error in the trial court's consideration of this evidence regarding a subsequent modification of Elliott's employment agreement.

**7. Whether the trial court abused its discretion by misapplying Pennsylvania's standard for a preliminary injunction when [Appellant] sought a preliminary injunction based on its likelihood of success on its claims for breach of contract unfair competition, tortious interference with existing and/or prospective business relationships, misappropriation of trade secrets, and civil conspiracy, but the trial court only addressed [Appellant's] breach-of-contract claim.**

Finally, Appellant argues that the trial court improperly applied the standard for a preliminary injunction, where the court only addressed Appellant's likelihood of success on its breach of contract claim. Appellant's Brief at 28-29. Appellant argues that the trial court failed to address its other claims regarding unfair competition, misappropriation of trade secrets, tortious interference with existing contract or prospective business relations,

---

[5] Appellant's present claim that the carve-out fails for lack of consideration was not presented to the trial court. Accordingly, it is waived for purposes of this appeal. *See* Pa.R.A.P. 302(a) (stating an issue cannot be raised for the first time on appeal).

and civil conspiracy. *Id.* at 29. Appellant argues that the trial court's failure to address each claim individually "is a textbook abuse of discretion." *Id.* at 30.

Our review confirms that the trial court's opinion addresses critical components of the claims raised in Appellant's PI Motion. For example, Appellant's PI Motion avers irreparable harm, based upon Defendants' solicitation of Appellant's customers. PI Motion, 2/18/25, ¶¶ 191-93. Appellant averred that the "irreparable injury which [Appellant] seeks to avoid by obtaining equitable relief arises from the very nature of the customer goodwill and confidential, proprietary and trade secret information that [Appellant] seeks to protect." *Id.* ¶ 194 (citation omitted).

Regarding Appellant's claim that Defendants misappropriated trade-secrets, the trial court found that Appellant failed to

> demonstrate that [Advisors] provided CWA with proprietary information, or improperly retained or misused proprietary information in any way. In particular, [Appellant's] Exhibit 33[, which Appellant] featured on cross-examination, contains NO personally identifiable information about clients, accounts, or any other information that may be deemed [a] trade secret….
>
> [Advisors] and CWA's principal[,] Ferguson[,] all testified that CWA directed [Advisors] not to bring anything with them from [Appellant] and not to solicit clients in violation of their respective agreements. [Appellant] did not present evidence that contradicted these statements.

Trial Court Opinion, 8/19/25, at 24-25. Similarly, the trial court summarized evidence that Advisors signed a memorandum of understanding with CWA that

they would adhere to "lawful legal restrictions" contained in their agreements with Appellant. *Id.* at 13. The trial court found that

> [f]urther verbal instruction from CWA included a directive that [Advisors] were to take nothing with them and that they were not to contact any of their clients or employees of [Appellant], which English, Elliott, and Craig complied with.

*Id.* at 13-14. The trial court's findings counter Appellant's claim of a conspiracy between Advisors and CWA to take clients, trade secrets, and proprietary information.

The trial court further found that in determining compensation needs, Advisors provided CWA with "back of the napkin math" and "rough estimates" of what "financial advisors with decades of experience could expect to earn and generate." *Id.* at 13. The trial court determined that Advisors did not provide CWA with customer lists, or accounts, and provided only rounded up or generalized the numbers to CWA. *Id.* at 12-13. The trial court found "[t]he information cannot be characterized as proprietary." *Id.* at 13. In fact, Panneton testified that he had no evidence that Advisors "physically took anything" regarding confidential or proprietary information. N.T., 4/23-24/25, at 222.

The trial court determined that "[t]he collective testimony of [Advisors] reflects that they felt that they could not continue to work under [] Panneton's management, and, therefore, they each began searching for new jobs." Trial Court Opinion, 8/19/25, at 10. This finding would contradict Appellant's claim

that CWA tortiously interfered with its contractual relations with Advisors. Rather, Panneton's actions drove Advisors to depart Appellant.

Thus, Appellant's argument that the trial court should have addressed each of Appellant's claims, individually, lacks merit and is belied by the record and the trial court's opinion. Appellant is owed no relief on this issue.

## Irreparable Harm

Finally, we observe that "[a]s an appellate court, we may uphold a decision of the trial court if there is any proper basis for the result reached; thus we are not constrained to affirm on the grounds relied upon by the trial court." *In re Strahsmeier*, 54 A.3d 359, 364 n.17 (Pa. Super. 2012) (citation omitted). Our review discloses uncontradicted evidence that Appellant failed to establish it would suffer irreparable harm if the trial court denied its PI Motion.

With respect to this issue, we are guided by the following:

An injury is regarded as "irreparable" if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard. Our courts have held, accordingly, that it is not the initial breach of the covenant which necessarily establishes the existence of irreparable harm but rather the unbridled threat of the continuation of the violation, and incumbent disruption of the employer's customer relationships.

Thus, grounds for an injunction are established where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant. The effect of such disruption may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are inherently unascertainable …. Consequently, the impending loss of a

business opportunity or market advantage also may be aptly characterized as an "irreparable injury" for purposes of equitable relief.

*York Group, Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1242 (Pa. Super. 2007) (citation omitted). Pennsylvania courts have previously concluded that impending or actual use of a former employer's trade secrets at an opponent firm to gain an advantage cannot be remedied through monetary damages and are "the types of harm that are not subject to exact valuation and compensation through damage awards." *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1233 (Pa. Super. 1989).

As stated above, Appellant's PI Motion avers irreparable harm, based upon Defendants' solicitation of Appellant's customers, and that the "irreparable injury which [Appellant] seeks to avoid by obtaining equitable relief arises from the very nature of the customer goodwill and confidential, proprietary and trade secret information that [Appellant] seeks to protect." Appellant. PI Motion, 2/18/25, ¶¶ 191-194 (citation omitted). Appellant claimed its

> information relating to client information and preferences, as well as [Appellant's] pricing, business strategies, growth targets, and other confidential information not readily ascertainable through publicly available sources[,] but painstakingly compiled through [Appellant's] client service and relationships, are of independent economic value.

*Id.* ¶ 141.

Appellant asserted that it "will be irreparably harmed if its former employees' client relationships, developed while at [Appellant,] are used to

develop a competitor's business." *Id.* ¶ 188. According to Appellant, "irreparable harm exists because of the risk that [Defendants'] wrongful conduct will cause indeterminable and incalculable damages to [Appellant]." *Id.* ¶ 193. Appellant averred that "[i]f Defendants are allowed to trade on [Appellant's] goodwill and to unlawfully compete against it, the value of those relationships to [Appellant] will be destroyed." *Id.* ¶ 195. Appellant further averred that Defendants would have an unfair advantage if they are allowed to compete with Appellant. *Id.* ¶ 196.

As stated above, the trial court determined that Advisors provided no client lists, trade secrets or proprietary information to CWA. Trial Court Opinion, 8/19/25, at 12-14, 24-25. Appellant could identify no clients misappropriated by Advisors or CWA. In addition, at the evidentiary hearing, Brian Mancos, Esquire (Attorney Mancos), Appellant's in-house counsel, testified that Appellant tracks its AUM, as well as the revenues it derives from AUM. N.T. (PI Motion Hearing), 4/23-24/25, at 106-07. Attorney Mancos identified the "good-will" taken from Appellant as "[t]he customer relationships that we've built over time during [Advisors'] employment." *Id.* at 108. Panneton confirmed, "I could look at any given day to see what revenue was lost[.]" *Id.* at 201. Panneton estimated Appellant's lost revenue as approximately $900,000. *Id.* at 202.

Because Appellant offered no evidence of unascertainable and non-compensable losses it would incur without the grant of a preliminary

injunction, we conclude that Appellant failed to establish the requisite irreparable harm that would result from denying its PI Motion. *See York Group, Inc.*, 924 A.2d at 1242 ("An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard."). Thus, we conclude the trial court's denial of Appellant's PI Motion is reasonable on this basis as well.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/18/2026